THE WESTERN NATIONAL BANK OF BALTIMORE ET AL. *vs.* THE NATIONAL UNION BANK OF MARYLAND ET AL.

*Husband and Wife—Charge on Wife's Statutory Separate Estate by a Promissory Note is not a Specific Lien as Against Other Creditors—Attachments Against Non-resident—Priorities—Effect of Judgment of Condemnation Nisi—Proof of Assets.*

A married woman executed a promissory note, together with her husband, prior to the Act of 1898, ch. 457, and added to her signature the words, "for the payment of which I bind my separate estate." She was then the owner of an undivided interest in certain land. *Held*, that this charge upon her estate did not create a specific lien upon the property or an equitable mortgage thereof, and that the holder of such note is not entitled to priority over other creditors of the married woman holding claims enforceable against her at law.

Different creditors of a non-resident married woman issued attachments against her, and caused the same to be laid upon her undivided interest in certain land, the sale of which had been decreed in a partition proceeding but had not then been made, and the attachments were also laid in the hands of the trustee to sell. Judgments of condemnation *nisi* were entered in the attachments. *Held*,

1st. That the attachments became inchoate liens on the defendant's interest in the land in the order of their respective levy, and the judgments of condemnation *nisi* ripened by operation of law into final judgments at the end of the terms of Court at which they were respectively entered, the liens of which related back to the dates of the attachments.

2nd. That after the sale of the land under the partition decree the liens of the attachments were transferred to the defendant's share of the proceeds of sale.

3rd. That since the attachment of one creditor, sufficient in amount to absorb the entire fund was issued and levied earlier on the same day

than other attachments, this attachment became the first lien and is entitled to precedence in payment.

A judgment of condemnation *nisi*, in an attachment against a non-resident, laid upon specific property, becomes absolute after the lapse of of the term of Court without further proof of the debt, since the provisions of the Code, Art. 9, sec. 13, relating to proof of debt and assets in the hands of a garnishee do not apply to attachments *in rem.*

Appeals from an order of the Circuit Court of Baltimore City (WICKES, J.)

The cause was argued before FOWLER, PAGE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*W. Burns Trundle,* for the Western National Bank, appellant.

As between the appellant and Catharine L. Horner, she has, by her contracts with the appellant, including those of August 26th and September 6th, 1895, made with the concurrence of her husband, *charged her separate estate,* represented by the balance of the proceeds of the sale thereof now to be distributed, with the payment of the sums of money in said contracts mentioned. Such charge is an *equitable lien* upon her share of the land, constituting her separate estate, and the proceeds of the sale thereof, in the nature of an equitable mortgage. "A lien is not, strictly speaking, either a *jus in re,* or a *jus ad rem,* that is, it is not a property in the thing itself, nor does it constitute a right of action for the thing. It more properly constitutes a *charge upon the thing."* 2 *Story Eq.,* sec. 1215; *Peck* v. *Jenness,* 7 Howard, 620; "Any agreement in writing, however informal, by which any property real or personal, is to be a security for a sum of money, is a charge, and amounts to an equitable mortgage." *Coote on Mortgages* (4 ed.) 305; *Hall & Hume* v. *Eccleston,* 37 Md. 510, 522; *Brown* v. *Macgill,* 87 Md. 170; The position taken by the auditor, and which appears to have been adopted by the Court below, denying that the contracts between the appellant and Mrs.

Horner and her husband are equitable liens or mortgages upon her separate estate, yet conceding that they give the appellant a right to proceed in equity to enforce the same against her separate estate, involves in itself a contradiction. Without a lien, the bank could enforce nothing against her separate estate ; would have no standing in a Court of Equity. *Balls* v. *Balls,* 69 Md. 389; *Frederick Co. Bank* v. *Shafer,* 87 Md. 55, 57.

This lien and charge of the appellant upon the separate estate of Mrs. Horner, consisting of her interest in the land devised to her by her father, and the balance of the proceeds of its sale, is good not only against Mrs. Horner, but against the appellees and the National Bank of Baltimore as well, having no equity superior to that of the appellant.

1. There is *no proof* in the record of the claims of either of said three claimants, as against Mrs. Horner. Her signature to none of their notes is proved. They all rely on mere docket entries to substantiate their claims. But docket entries cannot prove the validity of a proceeding *in rem,* as an attachment against a non-resident is. *Goldsmith* v. *Kilbourne,* 46 Md. 292.

2. But assume that the docket entries of " judgment of condemnation *nisi,*" on October 14th, 1895, two days after the appellees' alleged attachments were issued, are of themselves sufficient proof of such judgment, yet such a judgment gives no lien. " It is only after final judgment of condemnation on the return that final process of execution may issue. The mere laying of the attachment, or the seizure of property under it, creates simply an *inchoate lien,* which can only be rendered effectual by judgment of condemnation." *Rhodes* v. *Amsinck,* 38 Md. 355; *Morton* v. *Grafflin,* 68 Md. 564; *Code,* Art. 9, secs. 12, 13; *Laflin & Rand Co.* v. *B. & O. R. Co.,* 63 Md. 79; *Davidson* v. *Myers,* 24 Md. 555.

3. The appellees by going into the Superior Court in February, 1900, without the leave of the Circuit Court, and attempting to get absolute judgments of condemnation,

thus impliedly admitting the insufficiency of their alleged judgments of condemnation *nisi*, as of October 14th, 1895, have not bettered their position. On that day they attempted to get final judgment of condemnation of what? Of *the land attached.* But the last parcel of land was sold on the 16th December, 1896, and reported on 19th December, 1896. Upon the ratification of that sale (10th February, 1897), and the compliance of the purchaser with its terms, by giving his mortgage to the trustee for $90,000 for the credit payment, on 20th February, 1897, the mutation of the land into personalty was complete; there no longer existed *any land of Mrs. Horner* upon which a lien under the attachment could be fastened. *State* v. *Krebs*, 6 H. & J. 36; *Leadenham* v. *Nicholson*, 1 Har. & G. 277. But more than this, these claimants have, by their petition of 22nd November, 1897, engrafted upon the original suit a *creditor's suit*, and having done that, they are no longer at liberty to proceed at law, for the purpose of obtaining a priority over other creditors in the distribution of the fund. "And any lien asserted as a consequence of a judgment thus obtained, would be rejected and altogether disallowed by the Court of Equity as an unwarrantable interference with its jurisdiction." *Rhodes* v. *Amsinck*, 38 Md. 355. It is manifest, therefore, that the Union and Marine Banks are now in no better position than they were prior to February 6th, 1900, when they attempted to get final judgments of condemnation against the land *formerly belonging* to Mrs. Horner. As they had then no lien that a Court of Equity will recognize, so they have none now.

4. It is well settled that the equitable lien of a *bona fide* creditor will prevail over all other creditors who have not *a superior equity.* Such equitable lien outranks all prior general creditors; it shares *pari passu* with subsequent creditors. *Parnell* v. *Farmers' Bank*, 7 H. & J. 202; *Dyson* v. *Simmons*, 48 Md. 220; *Textor* v. *Orr*, 86 Md. 399.

5. Nor would the result be at all different, if it were as-

sumed, that the appellees acquired liens under their alleged attachments as of October 12th, 1895. Said attachments were based upon claims *all prior in point of date* to the three equitable liens of the appellant relied on in the distribution. An equitable lien or charge prevails over a judgment rendered after its date, based on a debt of the person creating the charge, contracted prior thereto. *Dyson* v. *Simmons, supra; Whitworth* v. *Gangain*, 3 Hare, 416; *Shakers* v. *Watson*, 37 U. S. Appeals, 141; 1 *Jones on Mortgages*, 162, 165; *Alexander* v. *Ghiselin*, 5 Gill, 139; *Price* v. *McDonold*, 1 Md. 414.

6. It must also be borne in mind, that when the appellees attempted to get a lien by attachment on Mrs. Horner's interest in the land, on October 12th, 1895, that interest was a mere equity of redemption, the legal estate was outstanding in Messrs. Shethar and Sanford, under their mortgage of September 17th, 1895. The appellees are then in the position of claiming a statutory lien upon a mere equitable estate. In such case the rule is *qui prior est tempore potior est in jure.* The equitable liens of the appellant of August 26th, and September 6th, 1895, must prevail over the alleged subsequent liens of the appellees of October 12th, 1895, based, as they are, on claims antedating the appellant's equitable liens. " As between mere equitable claims, equity gives no preference to mortgages, judgments, statutes or recognizances, but they are all payable according to their respective priority of dates." *Coote on Mortgages*, p. 822 (4th ed.)

7. The rule is that the charge of an equitable lien like other equities will be enforced not only against the mortgagor, but also against third persons. 2 *Am. & Eng. Ency.*, (2nd ed.), 141. Thus, it has been held that such a mortgage will be enforced against voluntary grantees, purchasers with notice, general creditors, attaching creditors, and judgment creditors of the mortgagor. *Donald* v. *Dewitt*, 33 Ala. 534, 549; *Welsh* v. *Usher*, 2 Hill Eq. (S. C.), 167, 170.

*John N. Steele* and *Albert C. Ritchie*, for the National Union Bank.

*William H. Dawson*, for the National Marine Bank.

*Allen McLane* filed a brief for the National Bank of Baltimore.

SCHMUCKER, J., delivered the opinion of the Court.

The bill in this case was filed to procure a sale of certain lands, of which Lewis Turner died seized, and a distribution of the proceeds among his six daughters and the issue of a deceased daughter in equal shares under the terms of his last will. Before the sale was made Catherine L. Horner, one of the daughters, made two mortgages on her interest in the land and also executed ·jointly with her husband the promissory notes hereinafter mentioned.

Before the proceeds of sale had been distributed the two mortgagees of Mrs. Horner's interest and also the parties to the present appeals, who are the four banks holding her notes, intervened in the partition case by appropriate petitions asking to be allowed her share of the fund. The mortgagees were paid off without objection, leaving as the residue of her share of the fund $3,139.52, to which the four banks made conflicting claims. The sole issue presented by these appeals is the question of the respective rights of the four banks to priority in the distribution of the $3,139.52.

The decree for the sale of the land was passed in the partition case on October 9th, 1888, but the sale was not made until December 16th, 1896. The petition of the Western National Bank was filed on December 23rd, 1895, and it asked to have the entire fund awarded to it without noticing the existence of other creditors. The petitions of the National Union and Marine Banks were filed on November 3rd, 1897, and that of the National Bank of Baltimore on March 3rd, 1900. These three banks in their petitions asked for a distribution of the fund among all of Mrs. Hor-

ner's creditors according to their legal priority. Each petition set up the alleged lien relied on by the party filing it.

The Western National Bank claimed that the notes held by it amounted by reason of their terms to an equitable mortgage, which gave to it a specific lien upon the fund. The other banks claimed the fund under attachments issued on the notes held by them, and levied as *per* schedule upon Mrs. Horner's interest in the land after the decree for its sale but before the sale had been made. The attachments were also laid in the hands of the trustee appointed to make the sale. The Circuit Court admitted all four banks as parties to the suit, but held that neither the alleged equitable mortgage nor the attachments created liens upon the fund and directed it to be divided among them *pro rata;* whereupon they all appealed.

None of the banks had direct dealings with Mrs. Horner, but each of them acquired, by discount, negotiable promissory notes which were either signed or endorsed by her jointly with her husband. The notes were all drawn to the order of J. D. Horner & Co., that being the title under which her husband conducted the straw goods business, or to the order of the Horner Miller Straw Goods Manufacturing Co., of which he was president. Each bank in discounting this paper relied in part upon Mrs. Horner's ownership of an interest in the land already mentioned.

All of the notes held by the Western National Bank, amounting in the aggregate to $18,700, were signed by Mrs. Horner and her husband as makers ; she signing last and adding after her signature the words "*for the payment of which I bind my separate estate.*" These words do not appear upon the notes held by the other banks which bear simply the joint signatures of Mrs. Horner and her husband as either makers or endorsers. The Western National Bank claims in its petition that the presence of the words just mentioned upon the notes held by it constituted all of them equitable mortgages upon Mrs. Horner's interest in the fund and entitled it to receive the entire fund, but in the

argument of ·the case it only claimed for its notes prece-
dence over all prior general creditors of Mrs. Horner with
the right to share *pari passu* with subsequent ones.   As
one of the notes held by this bank for $2,000, drawn to the
order of the Horner, Miller Straw Goods Manufacturing
Co. and dated September 6th, 1895, post-dates all of the
other claims, the precise contention of the bank is that it is
entitled to have this note paid in full out of the $3,139.52
and to share *pro rata* with the other banks in the distribu-
tion of the balance of that sum. ·

We will first consider this contention of the Western
National Bank and will subsequently ·discuss the effect of
the attachments issued by the other banks.

It is conceded by all parties that if the notes held by this
bank constitute equitable mortgages on Mrs. Horner's in-
terest in the land sold, the result claimed for them follows
under the authority of *Pannell* v. *Farmers' Bank*, 7 H. &
J. 206; *Dyson* v. *Simmons*, 48 Md. 220, and *Textor* v. *Orr*,
86 Md. 399.   But the other banks deny that these notes
are equitable mortgages and contend that the effect of the
words appearing on the face of the notes is simply to make
Mrs. Horner's separate estate liable in equity for their pay-
ment, and is not to make the notes *liens* on her estate.   They
claim that these notes are nothing more than contracts en-
forceable against her separate estate in equity, just as the
notes held by them are enforceable against her separate
estate at law, and they insist that the only difference between
the notes is, that those held by the Western National Bank,
by reason of the special clause appearing on their face, may
be enforced against the separate estate either at law or in
equity, while the others are enforceable only at law.

· Whatever may be the precise operation of these notes
held by the Western Bank, they do not seem to us to amount
to equitable mortgages.   An equitable mortgage results from
different forms of transactions in which there is present an
intent of the parties to make a mortgage, to which intent,
for some reason, legal expression is not given in the form of

an effective mortgage; but in all such cases the *intent to create a mortgage* is the essential feature of the transaction. Thus, an equitable mortgage has been held to result from a defectively executed legal mortgage (*Dyson* v. *Simmons, supra, Saunders* v. *McDonald,* 68 Md. 503); or from an agreement to execute a mortgage, if the agreement be certain in terms and clearly proven (*Nelson* v. *Hagerstown Bank,* 27 Md. 242; *Gill* v. *McAttee,* 2 Md. Chy. 255; *Textor.* v. *Orr,* 86 Md. 398); or from a deed absolute in form shown to have been in fact intended to operate as a mortgage. *Thompson* v. *Banks,* 3 Md. Chy. 138; *Artz* v. *Grove,* 21 Md. 456; *Brown* v. *Reilly,* 72 Md. 489. Although the notes now under consideration manifest a purpose to make her separate estate liable for their payment, it cannot be said that they show an intent to create a mortgage on that estate.

In ascertaining the true effect of the declaration by Mrs. Horner upon the face of these notes of an intent to bind her separate estate for their payment, it would serve no good purpose to review at length the history of the law in Maryland touching the ability of a married woman to bind her estate by contract. This has already been fully done in former decisions of this Court. It is sufficient to say, that prior to the Code of 1860, she could charge her separate estate in equity by contract if the intent to do so affirmatively appeared either upon the face of the obligation or by evidence *aliunde.* After the passage of the Code, which created what is commonly described as the wife's statutory separate estate, she could legally devise it and with the concurrence of her husband could alien or encumber it by deed or mortgage, and it was also held to be " liable in equity for all of the debts, incumbrances or other engagements which she together with her husband may by express terms or clear implication charge thereon." Since the Act of 1872 her separate estate can be made liable in an action against her at law upon any contract executed jointly by her with her husband. *Hall* v. *Eccleston,* 37 Md. 510; *Wingert* v.

*Gordon*, 66 Md. 106, 110; *Klecka* v. *Ziegler*, 81 Md. 482; *Brown* v. *Macgill*, 87 Md. 169, 170.   The Act of 1898, ch. 457, which makes radical changes in the powers and status of married women, has no bearing upon the present case.

This Court has never passed upon the effect of such a contract by a married woman, as the one now before us, upon the rights of other creditors holding her contracts enforceable at law against her separate estate.   In the case of *Hall & Hume* v. *Eccleston*, a somewhat similar contract, in which a wife jointly with her husband bound herself and her separate estate to pay a sum of money, was treated " so far as the wife is concerned " as constituting ." as between the parties " an equitable lien to be enforced in equity as being somewhat in the nature of an equitable mortgage, but the issue in that case was simply one between the original parties to a non-negotiable contract, and the rights of third parties were neither considered nor determined.

If no rights of third parties were here involved we should not hesitate, upon the authority of *Hall & Hume's case*, to direct the application of Mrs. Horner's share of the proceeds of sale to the payment of the debt of the Western National Bank, but as between that bank, holding a class of her obligations enforceable both at law and in equity against her separate estate, and the other banks holding a class of similar obligations enforceable only at law we can see no sound reason why the former should be preferred to the latter.

The conclusion at which we have thus arrived as to the true effect of the declaration by Mrs. Horner, on some of the notes, of her intent to bind her separate estate, was reached by the Court of Appeals of New York, in the case of *Maxon* v. *Scott*, 55 N. Y. 247; and by the Supreme Court of Wisconsin, in the case of *Todd* v. *Lee*, 16 Wis. 506; in both of which it was held that a charge by a married woman of a debt upon her separate estate does not create a specific lien, although it is enforceable against the estate in equity.

We will now consider the effect of the attachments.   Each of the three banks, other than the Western National, sued

out attachments for its claims against Mrs. Horner, who is a non-resident, and caused them to be levied as *per* schedule upon her interest in the land and also to be laid in the hands of the trustee who made the sale.    The attachments, as we have already said, were issued and served after the decree for the sale of the land but long prior to the sale.

The National Marine and Union Banks each issued an attachment on October 12th, 1895, which was on the same day levied as *per* schedule on Mrs. Horner's interest in the land, and two days thereafter judgment of condemnation *nisi* was entered in each case against the property attached. On October 15th, 1895, the National Bank of Baltimore, issued an attachment which was similarly levied and condemnation *nisi* was entered therein on November 11th, 1895. Subsequent attachments were issued and levied by the same banks, but in the view which we take of the case it is unnecessary to notice them as the two attachments first issued are more than sufficient in amount to cover the fund in dispute.

The attachments thus levied on Mrs. Horner's interest in the land became inchoate liens thereon in the order and as of the date of their respective levy.    The judgments of condemnation *nisi* entered therein ripened by operation of law into final judgments at the expiration of the respective terms of Court at which they were entered, although the plaintiffs could not have had execution thereon within a year and a day except by giving bond.    Such judgments constituted specific liens on the property condemned, which related back to the time when the attachments were laid.    *Cockey* v. *Milne*, 16 Md. 200; *Walters* v. *Munroe*, 17 Md. 505; *Johnson* v. *Foran*, 59 Md. 462; *Dawson* v. *Contee*, 22 Md. 27.    The liens of these attachments were subject to the operation of the decree for the sale of the land, and after the sale was made under the decree the lien was transferred to Mrs. Horner's share of the proceeds of sale.

Prior to the Act of 1880, ch. 28, a judgment of condemnation *nisi in personam* against a garnishee would have be-

come final in the same manner. *Friedenrich* v. *Moore*, 24 Md. 295; *Post* v. *Bowen*, 35 Md. 232. That Act, which is now sec. 13, of Art. 9 of the Code, prohibits the entry of final judgment of condemnation against a garnishee, without prior proof of the debt and of the amount of assets in his hands. In one place in the Act the expression, " no judgment of condemnation *nisi* shall be made absolute without such proof" occurs, but it is evident from the context, as well as from the expression itself, that it relates only to judgments against garnishees. The words " such proof" evidently refer to the preceding requisites of proof of the debt and of the amount of assets in the hands of the garnishee, the latter of which would have no reference to a judgment of condemnation *nisi* of property attached as per schedule.

The contents of the section also make it apparent that its scope and purpose were to protect garnishees from the hardship of the law as it formerly stood, under which they had often been made personally liable through mere neglect or oversight for the debts of defendants, to whom they owed nothing, and of whose assets they had none in their possession or under their control. It might be wise to so amend the existing law as to modify the terms upon which a judgment of condemnation of property attached as *per* schedule now becomes absolute, but that was evidently not the purpose of the Act of 1880.

The judgments of condemnation entered in the attachments now under consideration, having thus become absolute by operation of law, constituted specific liens in favor of the attaching banks upon Mrs. Horner's interest in the land as of dates long prior to the filing by those banks of the petitions in the partition case by which they set up their liens. The attachments of the National Marine and Union Banks were issued and levied on the same day, October 12th, 1895, but the record shows that the former was first issued and levied, and it therefore became the first lien and is entitled to precedence in payment. *Ginsberg* v. *Pohl*, 35 Md. 505. This attachment was for a note of $3,250, and is

more than sufficient to consume the entire fund which must be paid to it to the exclusion of the other banks.

The counsel for the Western National Bank contended that as the partition case had, so far as Mrs. Horner's share of the fund is concerned, assumed the form of a creditor's suit, by the filing of the petitions by her creditors, the attaching banks could not be permitted thereafter to perfect the lien of their attachments, but this position is not tenable. The judgments of condemnation became absolute at the end of the September term of Court, 1895, while the record contains no indication that the suit took on the form of a creditor's bill until nearly two years thereafter, when the proceeds of sale were about to be distributed. It is true that the Western National Bank filed its first petition in the partition suit on December 23rd, 1895, but an inspection of that petition shows that it did not mention or invoke the jurisdiction of the Court in behalf of the other creditors of Mrs. Horner, or ask for a distribution of her share of the fund among them, but simply asked to have her entire share awarded to it as the holder of a lien thereon. Nor did the order of Court on that petition contain any reference to the other creditors or any recognition of their rights.

The case of *Rhodes* v. *Amsinck*, 38 Md. 345, which was relied on by counsel for the Western National Bank in this connection, is quite distinguishable from the one now under consideration. In that case, in which the assets of a partnership were being distributed among its creditors under a creditor's bill, it was held that two attachments, one of which was by way of execution against one of the partners, and the other on warrant against the other partner, did not constitute liens *on the partnership assets*. Neither of the two attachments was levied as *per* schedule on any property. Both of them were laid in the hands of garnishees who appeared and pleaded *nulla bona*, and there had not been a trial, much less a condemnation in either suit. The same creditor issued both attachments and then without prosecuting them to trial he united with other creditors in a bill asking a Court of Equity

to assume jurisdiction over the distribution of the firm's assets for the benefit of all of its creditors, and the Court having assumed jurisdiction under the bill, it was held that such creditor would no longer be at liberty to continue the prosecution of his suits at law to obtain priority over the other creditors in the distribution of the fund. The facts of that case differ so radically from the one now before us that it affords no precedent for the determination of the issue here presented.

As the auditor's account which was ratified by the decree appealed from did not divide the fund in the manner here indicated as the proper one, the decree will be reversed in each of the cross-appeals and the case remanded for further proceedings in accordance with this opinion, the costs of both appeals to be paid out of the fund for distribution.

*Decree reversed and cause remanded.*

(Decided June 16th, 1900.)