INTERNATIONAL BEDDING COMPANY *vs.* TERMINAL WAREHOUSE COMPANY, Garnishee.

*Attachment by Garnishment—Goods in Possession of Warehouseman—Issue of Warehouse Receipts—Return by Sheriff—Goods Subsequently Received—Priorities.*

The sheriff's return on an attachment, to the effect that the writ was laid in the hands of a warehouse company, by service on its president, and "garnishee summoned and copy left," was sufficient to bind the company as garnishee with respect to any attachable property or credits.                        p. 483

Under Code, art. 14A, sec. 25, where negotiable receipts have been issued for goods in the possession of a warehouseman, the goods cannot be attached by garnishment or otherwise, unless the receipts are first surrendered to the warehouseman, or their negotiation enjoined.                        p. 484

Goods in the possession of a warehouseman before a negotiable warehouse receipt is issued therefor are subject to attachment by garnishment, but are not so subject after the receipt has been issued.                        p. 485

If a creditor's rights in goods in a warehouse have become fixed by garnishment of the warehouseman, the debtor and the warehouseman cannot destroy them by the latter's subsequent issue to the debtor of a negotiable warehouse receipt.    p. 485

Where the holder of bills of lading, desiring to store the goods, on their arrival at their destination, with a warehouseman, transferred the bills of lading to the warehouseman, to whom the carrier thereupon delivered the goods, the goods then became subject to the lien of an attachment by garnishment previously laid in the hands of the warehouseman on account of a claim against the original holder of the bills of lading, although the warehouseman immediately issued to him negotiable warehouse receipts for the goods.                pp. 486, 487

There may be an attachment by garnishment of goods of the debtor, coming into the possession and control of the garnishee

for the use of the debtor after the laying of the writ of attachment in the hands of the garnishee, without any actual seizure of the goods, or schedule and appraisal thereof by the sheriff.

pp. 487, 488

Under Code, art. 9, secs. 8, 10, 11, 15, 29, all lands and tenements, goods and chattels, rights and credits, are subject to attachment by way of garnishment.                              p. 488

In Maryland, all property and credits of the defendant coming into the garnishee's hands, or indebtedness accruing from the garnishee, after the garnishment, are bound thereby.

pp. 487-491

From the time of the garnishment the goods in the garnishee's possession, or that may come into his possession prior to the trial, are considered *in custodia legis,* and the garnishee is bound to keep them safely, and is not at liberty to change them, to convert them into money, or to exercise any act of ownership, it being his duty to hold them, until the question of his liability is determined, as well against the defendant as against any subsequent purchaser or pledgee.                              p. 492

If the specific goods attached are not in the hands of the garnishee at the trial for a judgment of condemnation, by reason of his having parted with or lost the possession of the goods, or surrendered them to the owner, the liability of the garnishee is to be ascertained by the value of the defendant's property in his hands from the date of the laying of the process in the garnishee's hands to the time of trial.                              p. 492

If it is established by the garnishee's confession of assets, by his answer to the interrogatories, or by admission or proof, that certain sufficiently described specific property is in the garnishee's possession at the trial or judgment, there may be a condemnation thereof, and the action is *in rem,* while if the garnishee has suffered or permitted such property to be withdrawn from his possession, a judgment *in personam* will then be recovered against him for the value of the property attached.

p. 492

That certain goods were seized, scheduled and appraised under the writ, and the sheriff also laid the attachment in the hands of a garnishee, summoned it, and left with it a copy of the writ, was in accordance with recognized practice, and was all

that was required to create an inchoate lien on all property in the hands of the garnishee.                         p. 493

The writ of attachment may be made to affect lands, goods, chattels or credits, or both corporeal and incorporeal property, under the same writ, which may lead to a judgment *in rem* or                                              p. 493

*Decided December 4th, 1924.*

Appeal from the Superior Court of Baltimore City (GORTER, C. J.).

Attachment proceeding by the International Bedding Company against William Fraser, Jr., Incorporated, the writ in which was laid in the hands of the Terminal Warehouse Company as garnishee. From a judgment quashing the attachment, the plaintiff appeals. Reversed.

The cause was argued before BOYD, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, BOND, and PARKE, JJ.

*Joseph France*, with whom was *Charles Lee Merriken* on the brief, for the appellant.

*S. Ralph Warnken* and *D. List Warner*, with whom were *Haman, Cook, Chesnut & Markell*, and *Piper, Carey & Hall*, on the brief, for the appellee.

PARKE, J., delivered the opinion of the Court.
The International Bedding Company bought of the William Fraser, Jr., Inc., three hundred bales of cotton linters which were to be delivered during the months of March and April, 1923. For the unliquidated damages flowing from a failure to make its delivery within the specified period, the International Bedding Company procured an attachment to issue out of the Superior Court of Baltimore City on May 23rd, 1923, against the William Fraser, Jr., Inc., as a nonresident corporation. At the time of the issuance of the writ,

the seller had in storage with the Terminal Warehouse Company two hundred bales of cotton linters for which the warehouse company had theretofore delivered to the seller, William Fraser, Jr., Inc., its four negotiable warehouse receipts. The warehouse company had then in possession for the carrier two other shipments of cotton linters of seventy-three and fifty bales, respectively, for which negotiable bills of lading were outstanding, and whose ownership was not known to the warehouse company.

The shipment of seventy-three bales was from Rose City Cotton Oil Mill to itself as consignee, with an instruction to notify the Maryland Bedding Company, a local business corporation. These bales were received by the warehouse company on May 23rd, 1923, but it was not until June 8th, 1923, that the outstanding negotiable bill of lading was presented and delivered by William Fraser, Jr., Inc., the holder in due course by endorsement, to the warehouse company; whereupon these seventy-three bales were stored in the name of the William Fraser, Jr., Inc., and a negotiable warehouse receipt therefor was issued and delivered to it by the warehouse company. The ignorance of the warehouse company as to the ownership of the other lot of fifty bales was caused by these circumstances. The William Fraser, Jr., Inc., had shipped to itself as consignee on April 9th, 1923, fifty bales of cotton linters, and, on April 11th, 1923, another fifty bales; and received a separate negotiable bill of lading for each shipment. These two shipments were transferred *en route* into one car, which arrived at the warehouse company on May 8th. The shipment did not correspond to the original billing, and only one of the negotiable bills of lading was received, so the additional fifty bales in the freight car were unaccounted for and could not be delivered by the carrier until the confusion in transportation was ascertained, the goods were identified, and the other negotiable bill of lading was produced and surrendered. These fifty bales remained at the warehouse of the appellee under these circumstances until June 18th, 1923, when the bill of lading in

question was delivered to appellee by the William Fraser, Jr., Inc., with instructions to surrender the bill of lading to the carrier, receive the bales, and place them in storage in the name of William Fraser, Jr., Inc., issuing a negotiable warehouse receipt therefor. The appellee issued and delivered its negotiable warehouse receipt to William Fraser, Jr., Inc., on June 18th, 1923, when the bill of lading was received, and a day later the goods were delivered by the carrier and placed in storage by the appellee.

The International Bedding Company was aware that the warehouse company had in storage the two hundred bales, but did not have any knowledge of the two shipments of fifty and seventy-three bales. The sheriff went to the warehouse where fifty of the two hundred bales were stored, and to the other warehouse where the remaining one hundred and fifty bales were; asked for the specific bales, which were indicated to him; and attached, scheduled and appraised the fifty bales on May 23rd, 1923, and the one hundred and fifty bales on May 25th, 1923. The two hundred bales thus scheduled and appraised were left in the possession of the appellee by direction of the attaching creditor. The sheriff's return was that these two hundred bales had been so attached, and that the writ was "also laid in hands of Terminal Warehouse Company, a corporation, by service on Samuel F. Lippincott, president, 23rd May, 1923, and garnishee summoned and copy left." Under the authorities, this was sufficient to bind the appellee as garnishee with respect to any attachable property or credits.

The lower court quashed the attachment as to both the two hundred bales and the one hundred and twenty-three bales, on the ground that none was attachable property in the hands of the appellee. There can be no question of the correctness of this ruling to the extent of the two hundred bales, which were in the possession of the appellee as warehouseman and for which, prior to the laying of the writ of attachment, it had issued negotiable warehouse receipts to the owner. These receipts had not been surrendered to the

appellee, nor had their negotiation been enjoined, before the seizure of the goods by the sheriff under the writ. Under such circumstances, the garnishment of these two hundred bales was explicitly inhibited by the Uniform Warehouse Receipts Act in force at the time. *Section 25 of article* 14A *of the Code of Public General Laws.*

The appellant does not contend that there was any error below except in the holding that the remaining one hundred and twenty-three bales were not subject to attachment by garnishment in the hands of the warehouseman. The question as to the propriety of quashing the attachment so far as these bales are concerned involves, first, whether or not these bales are within any statutory exemption from attachment and, second, if not, were they so attached as to constitute a valid garnishment in the hands of the appellee.

First: The position of the appellee is that the one hundred and twenty-three bales of cotton linters were represented at the time of the laying of the attachment by outstanding negotiable bills of lading, and were, therefore, not subject to attachment, by virtue of the Uniform Sales Act (Code, art. 83, sec. 60) and of the Uniform Bills of Lading Act (Code, art. 14, sec. 24). Both of these provisions and that of the Uniform Warehouse Receipts Act (Code, article 14A, sec. 25) are similar in their language. They provide that (a) if a negotiable document of title to goods as defined in section 90 of article 83 be issued by a bailee, (b) or if a negotiable bill of lading be issued for goods by a carrier, (c) or if a negotiable warehouse receipt be issued for goods by a warehouseman, on the delivery of the goods by the owner, the goods, in any one of the three instances stated, cannot *thereafter,* while in the possession of the bailee, or of the carrier or of the warehouseman, be attached by garnishment or otherwise, or be levied upon under an execution, unless the aforesaid negotiable documents of title be first surrendered to the bailee, carrier or warehouseman, as the case may be, or be impounded by the court.

As the negotiable bills of lading for the one hundred and twenty-three bales were issued *before* the writ of attachment,

the carrier was unquestionably not subject to garnishment; by reason of this provision of the statute. But, for the third party, the warehouseman, to be brought within the terms of the statute relied on, it is an indispensable prerequisite of the act that the negotiable warehouse receipt be issued *before* the goods are attached by garnishment or otherwise, or are levied on by execution. The statutes implicitly recognize that if the negotiable document of title has not been issued, the goods may be attached by garnishment or otherwise or be levied on by execution.

It cannot successfully be contended either that goods in the possession of a warehouseman *before* a negotiable warehouse receipt is issued are not subject to attachment by garnishment; or that such goods may be made the subject of a garnishment after such issuance. The change in the status of the goods is, therefore, under the act, referable to the *time* of the issuance of a negotiable warehouse receipt for the goods. If a creditor's rights in the goods have become fixed by garnishment, the debtor and the warehouseman may not destroy them by the warehouseman's subsequent issue to the debtor of a negotiable warehouse receipt. If so, a debtor could destroy an inchoate lien created by law and deprive his creditor of the fruits of his diligence. To permit this would open a new way of escape for the debtor's goods, and defeat a primary object of attachment, without any statutory authorization. All that a purchaser of a negotiable warehouse receipt is entitled to enjoy under the statute cited is the right to rely upon the status of the goods, represented by the receipt, not becoming affected, after its issuance, by attachment by garnishment or otherwise, or by levy under an execution. The purchaser of a negotiable warehouse receipt acquires only such title to the goods as the person negotiating the receipt to him had, or had ability to convey to a purchaser in good faith for value, and also such title to the goods as the depositor or person to whose order the goods were to be delivered by the terms of the receipt had, or had ability to convey to a purchaser in good faith for value, and the direct obligation of the warehouseman to hold possession

of the goods for him according to the terms of the receipt as fully as if the warehouseman had contracted directly with him. (Code, art. 14A, sec. 41.)

However great the desire to interpret the laws mentioned so as to enforce their object to afford protection to bailees, carriers and warehousemen, and to holders in good faith for value of negotiable documents of title of goods, the plain language of the acts may not be disregarded; and there can be no justifiable inclination to that course when its effect would be to impair the efficacy of an established and valuable procedure on the part of creditors to subject the property of their debtors to the payment of their claims.

In this case, the carrier held the goods subject to the surrender thereof to the holder of the outstanding bills of lading, and, pending this surrender, the warehouseman had the temporary custody of the goods which were then owned by the William Fraser, Jr., Inc., by virtue of its ownership of the negotiable bills of lading. The holder of the bills desired to store the goods for which the bills were issued with the warehouseman and to receive therefor a negotiable warehouse receipt from the warehouseman. In order to do this, it was necessary to accomplish a complete change in the relation of all the respective parties, and in the status of the goods. Before the change could be made, the care of the goods for the carrier by the warehouseman had to become an actual possession of the goods by the warehouseman. This was brought about by the transfer of the negotiable bills of lading to the warehouseman, and a delivery to it by the carrier of possession of the goods on its surrender to the carrier of the bills. The warehouseman then had, for the first time, complete possession of the goods, for the use of the owner, who was the debtor in the garnishment. At this juncture, the inchoate lien of the garnishment attached to the property, and the warehouseman and debtor had no more power to destroy this lien than if the goods had been actually seized by the officer. When the warehouseman issued the negotiable warehouse receipts, it held both the goods as warehouseman

and the receipts as the bailee of the debtor for a short, but necessary and appreciable, time, before it forwarded the negotiable receipts by mail to the debtor and owner of the receipts.    Before these transactions the garnishment was in operation.    By this garnishment the warehouseman had been warned or notified to hold, subject to the lawful rights therein of the creditor, all attachable property subsequently coming into its possession for the use or benefit of the debtor. 2 *Poe's Pl. & Pr.* (4th Ed.), sec. 532; *Farmers and Merchants Bank* v. *Franklin Bank,* 31 Md. 404, 412, 413; *Wade on Attachments,* sec. 338; *Rood on Garnishments,* sec. 192.

These facts distinguish this case from the two Pennsylvania cases cited by appellee.    In *Stamford Rolling Mills Company* v. *Erie R. Co.,* 257 Pa. 507, the shipment was stopped *in transitu* by the consignor to whose order the negotiable bill of lading was issued by the carrier.    The consignment was made on May 23rd; the stoppage *in transitu* was on May 25th, and the writ of attachment was issued on June 28th, while the goods were in the possession of the carrier, which was also the garnishee, and while the negotiable bills of lading remained outstanding.    The case of *Pottash* v. *Albany Oil Co.,* 274 Pa. 384, was one where the seizure of the goods in transit and the garnishment of the bank holding the bill as a collecting agent were both made *after* the issuance of the negotiable bill of lading, and while it was in force.    These cases were, therefore, correctly decided to be within the express terms of the Uniform Bills of Lading Act of Pennsylvania, which are similar to section 24 of the Maryland act, but they cannot be accepted as authority for the appellee's position on this appeal.

Second.    The remaining question is whether or not an attachment by garnishment of the goods of the debtor coming into the possession and control of the garnishee for the use of the debtor, after the laying of the writ of attachment in the hands of the garnishee, was sufficiently made in the absence of an actual seizure of the goods, a schedule and an appraisal thereof by the sheriff.    The solution of this in-

quiry involves a consideration of the nature of a garnishment, and the procedure necessary to make it effective.

The operation of an attachment whereby property which cannot be seized may be reached by the writ, and debts due to the defendant may be subjected to the payment of his debts, is the distinctive feature of attachment by the custom of London from which the attachment law in Maryland has descended. The peculiar operation of the process by which effects of the defendant, which cannot be seized and taken into custody, may still be rendered liable to the payment of his debts, has received the designation of garnishment or warning, and the person in whose hands such effects are attached is styled garnishee, because of his being garnished or warned not to pay the money or deliver the property of the defendant in his hands to him, but to appear and answer the plaintiff's suit.

In view of the clear provision of the statute, which has remained in force since its enactment in 1795, that any kind of property or credits belonging to the defendant, in the plaintiff's own hands, or in the hands of any one else, may be attached, it would seem useless to cite authorities to sustain the proposition that under the Maryland act all lands and tenements, goods and chattels, rights and credits are subject to attachment by way of garnishment. Code, art. 9, secs. 8, 10, 11, 15, 29. *Drake on Attachment* (7th Ed.), secs. 450, 451A; *Hodge and McLane on Attachment,* sec. 75.

As garnishment is usually a purely statutory proceeding, the general rule is that, unless there is a provision authorizing it, no effects of the defendant coming into the garnishee's hands, or indebtedness accruing from the garnishee, *after the garnishment,* are bound thereby. *Supra.* In Maryland, however, this general rule does not prevail. *Drake on Attachment* (7th Ed.), sec. 667. As the contrary view is urged on this appeal, it may be well to examine and set forth the origin and authority for the Maryland practice.

In *Turner* v *Lytle,* 59 Md. 199, this Court said: "All our attachment laws have grown out of the 'foreign attachment'

proceeding by the custom of London, which is of great antiquity, and forms a part of our common law, our statutes being but regulations as to the enforcement of rights existing independently of statute. *Drake on Attachment,* sec. 1; *Campbell* v. *Morris,* 3 H. & McH. 535." According to *Sheetz* v. *Hobensock,* 20 Pa. St. 412, 413, the custom of London is described in this excerpt from *Bohun's Privilegia Londini,* pp. 255, 261: "If A attaches the money or goods of M in the hands of R, and if R has no money or goods in his hands belonging to M, at the time when the attachment shall be made; and it shall happen that six minutes after R shall become indebted to M, or have goods in his hands belonging to M, the plaintiff A, by virtue of the attachment made as aforesaid, shall recover the money or goods he shall prove came to the hands of R, *after the attachment made.* The general issue upon all attachments being whether R, who is called the garnishee, at the time of the attachment made, *or at any time thereafter,* had any money or goods of M in his hands."

In 1836 we find this custom of London fully and firmly established in Maryland. In the work of Edward Hinkley on the Maryland Law of Attachment, published in that year, the author states the law to be that "any goods or credits of the defendant which come to the hands of the garnishee after the laying of the attachment in his hands and before judgment or trial, are liable, in like manner, as those which were in his hands at the time of the service." Ch. VII, p. 81. Furthermore, in an appendix, at page 109, is a form of interrogatories to be put to the garnishee. The first interrogatory was whether the garnishee, at any time before or after the laying of the writ in his hands, was indebted to the defendant. The second inquiry was: Did the garnishee have at the time of the laying of the attachment in his hands, or at any time since, or did he then have in his possession, or under his care or trust *any goods, chattels, merchandise, property, money or effects* belonging to the said debtor? And the fourth question was whether the garnishee had, since the

service of the process, paid any money or *delivered any goods, property or effects* to the debtor or to any person for his use or benefit.

The significance of the form of these interrogatories is that they were seeking discovery of the garnishee for the purpose of ascertaining and bringing within the lien of the writ the goods, chattels and credits of the debtor which had been in the possession of the garnishee, or had been owing by him to the debtor, from the laying of the attachment in the garnishee's hands to the moment of trial or judgment. *Devries* v. *Buchanan,* 10 Md. 214; 2 *Poe, Pl. & Pr.,* sec. 545.

In Hinkley and Mayer on The Law of Attachments in Maryland (1869), the law is stated in accordance with the earlier book of Edward Hinkley, and the interrogatories are similar. Section 115, p. 41; section 222, pp. 88, 89; section 225, p. 89; *Hodge and McLane on Attachment,* pp. 256, 257, form No. 16, pp. 188, 189. Furthermore, the authors supported their text by the decisions of this Court.

In *Devries* v. *Buchanan* (1856), 10 Md. 210-215, one of the questions for the Court was whether or not the garnishee could be made by interrogatories to discover what money and "effects" of a storekeeper had been received by the garnishee either before or after the service of the writ of attachment, and this Court then held that the interrogatory should have been permitted by the lower court to obtain a discovery for the purpose of ascertaining whether the property or effects in controversy be liable under the process at the time of trial. *Peters* v. *Cunningham,* 10 Md. 554, 555, 559.

In *Glenn* v. *Boston Glass Co.* (1854), 7 Md. 287, the attachment was laid in the hands of the permanent trustee in insolvency as garnishee at a time when he had not received in his actual possession any of the funds of his insolvent, and this was an objection urged against the operation of the attachment. The appellate court rejected this contention, holding that, as the trustee was legally entitled to the possession and control of the funds from the time of the petition in insolvency, the attachment was properly laid in his hands,

and that *actual* possession of money or property on the part
of the garnishee is not necessary to make an attachment
efficacious or operative.   Moreover, at the time of the rendi-
tion of the judgment of condemnation in that case, the funds
had been reduced to actual possession by the garnishee; and
it was held to be the general practice under our attachment
system to condemn all credits or property in the hands of the
garnishee or debtor at the time of the trial, by virtue of the
provisions of the fifth and sixth sections of the Act of 1795,
chapter 56, which have been in force to the present.   Code
of Public General Laws, art. 9, sec. 15.

   This early construction of the statute, that an attachment
affects all property and credits of the debtor in the hands of
the garnishee or which may come to his hands at any time
after laying the attachment and before trial, is the settled
law of this State.   *Devries* v. *Buchanan,* 10 Md. 210, 214;
*First National Bank* v. *Jaggers,* 31 Md. 38, 51; *Groome* v.
*Lewis,* 23 Md. 137-152; *Hardesty* v. *Campbell,* 29 Md. 533-
538; *Farmers and Merchants Bank* v. *Franklin Bank,* 31
Md. 404-412; *Early* v. *Dorsett,* 45 Md. 462, 467; *Nicholson*
v. *Crook,* 56 Md. 55-57; *Stockbridge* v. *Franklin Bank,* 86
Md. 189-200; *Farley* v. *Colver,* 113 Md. 379, 385, 387.

   If there could be any question as to this statement of the
law, the forms of verdicts found in 2 *Evans' Harris' Entries*
(1832) (Forms 125 and 126, pp. 336, 337), should be con-
clusive.   In the verdict for the plaintiff the jury found the
value of the goods, chattels and credits in the hands of the
garnishee either at the time of the laying of the attachment
in his hands, or at the time of the rendition of the verdict.
If the verdict was for the garnishee, the jury "upon their
oath do say the said G. G. at the time of laying the said at-
tachment in the hands of him the said G. G. had not, nor at
any time since hath had, nor now hath, any of the goods,
chattels or credits of the said D. D. in his hand."   See
"Pleas," *Idem.,* pp. 45-47, 2 *Poe, Pl. & Pr.,* sec. 542, p. 604.
These are in entire accord with the above citation from
*Bohun's Privilegia Londini.*   "The general issue upon all

attachments being whether R, who is called the garnishee, at the time of the attachment made, *or at any time thereafter,* had any money or goods of M in his hands." *Supra.*

It therefore follows that, from the time of the garnishment, the goods in the possession of the garnishee, or that may come into his possession prior to the trial, are considered as *in custodia legis,* and the garnishee is bound to keep them safely, and, as was said in *Brashear* v. *West,* 7 Peters, 608-622, is not at liberty to change them, to convert them into money, or to exercise any act of ownership over them. It is his duty to hold them until the question of his liability is determined, as well against the defendant as against any subsequent purchaser or pledgee. Consequently, if the specific goods attached are not in the hands of the garnishee at the trial for a judgment of condemnation, by reason of his having parted with or lost the possession of the goods or surrendered them to the owner, the liability of the garnishee is to be ascertained by the value of the defendant's property in his hands from the date of the laying of the process in his hands to the time of the trial. 2 *Poe, Pl. & Pr.* (4th Ed.), sec. 530. *Drake on Attachment* (7th Ed), secs. 671, 224. *Hodges and McLane on Attachment,* section 87, p. 77; section 109, p. 169; Form 44, p. 258; Form 45, p. 259. *Rood on Garnishment,* sec. 192; *Wade on Attachment,* secs. 338, 331, 529; *Western Bank* v. *Union Bank,* 91 Md. 623; *Ohio Brass Co.* v. *Clark,* 86 Md. 348.

If, in the course of the proceedings, it shall be established by the garnishee's confession of assets, by his answer to the interrogatories, or by admission or proof, that certain sufficiently described specific property is in the possession of the garnishee at the trial or judgment, there may be a condemnation thereof, and the action is *in rem.* If, however, the garnishee has suffered or permitted such property to be withdrawn from his possession, a judgment *in personam* will then be recovered against him for the value of the property attached. *Buschman* v. *Hanna,* 72 Md. 1, 5, 6.

In this case certain goods were seized, scheduled and appraised under the writ, but the sheriff, also, laid the attachment in the hands of the garnishee, summoned it, and left with it a copy of the writ.  This is in accordance with recognized practice, and is all that is required to create an inchoate lien on all property and credits attachable in the hands of the garnishee.  The writ may be made to affect lands, goods, chattels or credits, or *both* corporeal and incorporeal property, under the same writ, which may lead to a judgment *in rem* or *in personam,* or to *both* a judgment *in rem* and *in personam.*  *Hodges and McLane on Attachment,* secs. 99, 101, 105A, 184, 190; *Boyd* v. *Ches. & Ohio Canal Co.,* 17 Md. 195, 210; *Hadden* v. *Linville,* 86 Md. 210, 227; *McCoy* v. *Boyle,* 10 Md. 396, 397; *Freidenrich* v. *Moore,* 24 Md. 295, 309.

In this case, therefore, the effect of the laying of the attachment in the hands of the warehouse company was to warn and notify it that all goods of the debtor, then in, or subsequently coming into, its possession, as warehouseman, were subject to the inchoate lien of the attachment by garnisment.  The one hundred and twenty-three bales of cotton linters belonging to the debtor did afterwards come into its possession while the garnishment was in full effect.  The proof before the lower court described and identified them beyond all possible controversy by the records kept by the warehouse company for its own information and to enable it to discharge its obligations to its bailors and as a warehouseman.  Upon the principles and under the rules discussed in this opinion, the action of the court in quashing the writ as to the one hundred and twenty-three bales of cotton linters is reversible error.  *De Bearn* v. *De Bearn,* 119 Md. 418; *De Bearn* v. *Winans,* 119 Md. 390, 397, 399; *De Bearn* v. *De Bearn,* 115 Md. 668, 676, 677, 611, 612; *Hadden* v. *Linville,* 86 Md. 210, 227; 28 C. J. sec. 349, n. 51.

*Judgment reversed, and new trial awarded, with costs to appellant.*