*Keith Yacko, et al., v. Rene Mitchell*
No. 1586, Sept. Term, 2019
Opinion by Leahy, J.

**Foreclosure Proceedings > Power of Sale > Principles**

Fundamentally, the current and prior appeals highlight two elemental principles underlying Maryland foreclosure procedure. First, a "power of sale foreclosure is intended to be a summary, in rem proceeding[,]" *Wells Fargo Home Mortg., Inc. v. Neal*, 398 Md. 705, 726 (2007) (cleaned up), in which there should be no doubt as to the validity of the lien and the lien instruments, Md. Rule 14-207(b)(1) (requiring lien instrument be "supported by an affidavit that it is a true and accurate copy"). Second, as the action is "peculiarly within a court of equity's jurisdictional powers," the foreclosure must be free of any "fraudulent, illegal or inequitable conduct." *Wells Fargo*, 398 Md. at 728, 730. Title 14 of the Maryland Rules implements these dual precepts by providing a summary procedure for a foreclosure pursuant to a power of sale but requiring lenders to attest to the validity of their lien and lien instruments. The remedy afforded a lender in a foreclosure is premised on the requirement that the lender submit a true and accurate copy of the lien instruments. If a lender cannot establish, for whatever reason, the validity of its lien, it must pursue another avenue to assert its rights under the mortgage.

**Testimony > Credibility Determination**

As the factfinder, the court analyzes the evidence and decides what to credit and what to reject. *Santiago v. State*, 458 Md. 140, 156-57 (2018) (affirming that "the fact finder 'may believe or disbelieve, credit or disregard, any evidence introduced, and a reviewing court may not decide on appeal how much weight must be given to each item of evidence'") (citing *Great Coastal Express, Inc. v. Schruefer*, 34 Md. App. 706, 725 (1977)); *Qun Lin v. Cruz*, 247 Md. App. 606, 629 (2020).

**Testimony > Credibility Determination**

Clearly, the evidence presented by the Substitute Trustees to support their revised theory of the case—that Ms. Mitchell made everything up—fell woefully short, and the validity of the lien instrument could not be established against the unrefuted evidence presented by Ms. Mitchell. Viewing all the evidence in the light most favorable to Ms. Mitchell, we hold that substantial evidence in the record supports the circuit court's factual findings and that the court did not err in its determination that the lien instrument upon which the Substitute Trustees filed the order to docket foreclosure was invalid.

**Testimony > Legal Impossibility**

Long ago, the Court of Appeals instructed courts when to disregard a witness's testimony as lacking in probative value:

> We, of course, accept the rule that the court should disregard any testimony that attempts to establish something physically impossible within common knowledge and experience, or something contrary to indisputable scientific principles or laws of nature within the court's judicial knowledge.

*York Motor Exp. Co. v. State, for Use of Hawk*, 195 Md. 525, 534-35 (1950). Otherwise, "the question of a witness's credibility is left to the [fact finder]." *N.B.S., Inc. v. Harvey*, 121 Md. App. 334, 343 (1998).

**Testimony > Legal Impossibility**

Unlike *Ray v. Bassil*, 30 Md. App. 550 (1976), and *Tippett v. Quade*, 19 Md. App. 49 (1973)—cases in which physical evidence precluded the fact-finder from relying on a witness's testimony—Ms. Mitchell's testimony can be reconciled with the evidence very easily. We conclude that the conflicts presented in this case did not present a "physical impossibility" under *York Motor Express* or *Kucharczyk*; but rather, ordinary inconsistencies that the circuit court was entrusted to resolve. As addressed above, this is exactly what Judge Mittelstaedt did.

**Foreclosure Proceedings > Power of Sale > Equitable Mortgage**

The record supports the trial court's decision to ignore the Substitute Trustees' efforts to seek an equitable mortgage at the eleventh hour. They did not assert their entitlement to an equitable mortgage when they filed their order to docket, or allege any entitlement to an equitable mortgage in any pleading, or assert any such claim at any point during the *nine-day evidentiary hearing, which covered two years*. Instead, after the close of all evidence, the Substitute Trustees asserted, for the first time, that "U.S. Bank, as trustee[,] is entitled to an equitable lien on the property." The impact of the Substitute Trustees' last-minute request deprived Ms. Mitchell of any opportunity to respond and, certainly, deprived her of the ability to present her evidence at the hearing in light of this claim. Accordingly, we hold that the circuit court did not err by not considering the Substitute Trustees' post-hearing request for an equitable mortgage.

Circuit Court for Prince George's County
Case No. CAEF15-20853

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1586

September Term, 2019
_____

KEITH YACKO, ET AL.

v.

RENE MITCHELL
_____

Nazarian,
Leahy,
Friedman,

JJ.
_____

Opinion by Leahy, J.
_____

Filed: February 26, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Like a boomerang, the mortgage transaction that was the subject of our reported opinion in *Mitchell v. Yacko*, 232 Md. App. 624 (2017), has returned. The substitute trustees for the loan servicer in this case, Keith M. Yacko, Robert E. Frazier, Thomas J. Gartner, Jason L. Hamlin, Glen H. Tschirgi, and Gene Jung (collectively, "Substitute Trustees") attempted to foreclose on a note and deed of trust pursuant to a power of sale by filing an order to docket. Ms. Renee Mitchell, the borrower and homeowner, representing herself, responded by filing a motion to dismiss the foreclosure action because the note and deed of trust were not valid and enforceable.

In round one, Ms. Mitchell's motion was denied without a hearing, and she appealed. We held "that a party cannot institute a foreclosure upon forged documents. Foreclosure is an equitable procedure, and the Substitute Trustees must demonstrate, upon remand, that this particular foreclosure has not 'been marred by fraudulent, illegal, or inequitable conduct.'" *Id.* at 641 (citation omitted) (cleaned up). Now, in the second round, we address the Substitute Trustees' appeal, and Ms. Mitchell's cross-appeal, from Judge Crystal Mittelstaedt's order in which she dismissed the foreclosure after presiding over a nine-day evidentiary hearing held pursuant to Maryland Rule 14-211(b)(2).

The Substitute Trustees claim that Judge Mittelstaedt erred in her determination that the lien instrument was invalid and abused her discretion in declining their request for discovery prior to the evidentiary hearing. They also contend that the court erred in denying their request for an equitable mortgage—an issue raised for the first time in their briefing filed after the evidentiary hearing. In her cross-appeal, Ms. Mitchell avers that the judge abused her discretion in excluding Ms. Mitchell's expert.

We affirm the court's order dismissing the foreclosure on the ground that "Ms. Mitchell established that the lien and lien instruments are invalid, and that [the Substitute Trustees] have no right to foreclose on an adjustable mortgage."

Fundamentally, the current and prior appeals highlight two elemental principles underlying Maryland foreclosure procedure. First, a "power of sale foreclosure is intended to be a summary, in rem proceeding[,]" *Wells Fargo Home Mortg., Inc. v. Neal*, 398 Md. 705, 726 (2007) (cleaned up),[1] in which there should be no doubt as to the validity of the lien and the lien instruments, Md. Rule 14-207(b)(1) (requiring lien instrument be "supported by an affidavit that it is a true and accurate copy"). Second, as the action is "peculiarly within a court of equity's jurisdictional powers," the foreclosure must be free of any "fraudulent, illegal or inequitable conduct." *Wells Fargo*, 398 Md. at 728, 730. Title 14 of the Maryland Rules implements these dual precepts by providing a summary procedure for a foreclosure pursuant to a power of sale but requiring lenders to

---

[1] Previously, the "policy of Maryland law" was mainly "to expedite mortgage foreclosures." *Wells Fargo*, 398 Md. at 726. In response to the 2008 subprime mortgage crisis, the Maryland General Assembly enacted a series of statutes and amended existing statutes to "further protect the interests of mortgagors relating to foreclosures, especially foreclosures of residential properties." *Maddox v. Cohn*, 424 Md. 379, 386-87 (2012); *see also Daughtry v. Nadel*, 248 Md. App. 594, 622 (2020) (noting that the General Assembly's policy not to include mortgage foreclosure actions within three-year statute of limitations "is in accord with its general goal since the beginning of the Great Recession of 'slowing down the foreclosure process[.]'" (quoting *Maddox*, 424 Md. at 387)). The post-2008 legislative enactments were designed, in part, to "slow down the mortgage foreclosure practices to limit the abuses of past years and to provide additional protections to homeowners." *Maddox*, 424 Md. at 392-93. Prior to these enactments, for example, a foreclosure action "could be filed . . . as soon as 15 days after default," but the new requirements constrain a mortgage holder to wait at least 90 days from a borrower's default to file an order to docket commencing a foreclosure. *Id.* at 390 n.8.

2

attest to the validity of their lien and lien instruments.[2]  The remedy afforded a lender in a foreclosure is premised on the requirement that the lender submit a true and accurate copy of the lien instruments.  If a lender cannot establish, for whatever reason, the validity of its lien, it must pursue another avenue to assert its rights under the mortgage.

Because of the high volume of foreclosure cases, recurrent plaintiffs often treat these matters as routine and expect our courts to rubber-stamp the foreclosure with methodical expediency.  However, to the homeowner, there is nothing routine about losing a home, and, when a homeowner asserts a timely, valid challenge to a foreclosure, the Maryland Rules instruct our courts to slow the foreclosure action as necessary to protect the homeowner and ensure that the instruments are valid and that the plaintiffs otherwise have a right to foreclose.

---

[2] The relevant provisions of Title 14 of the Maryland Rules are derived from the mandates contained in Title VII of the Real Property Article ("RP") of the Maryland Code (1974, 2015 Repl. Vol.).  For example, section 7-105(b)(1) specifies: "A mortgage or deed of trust may authorize the sale of the property or declare the borrower's assent to the passing of a decree for the sale of the property, on default in a condition on which the mortgage or deed of trust provides that a sale may be made."  RP § 7-105(b)(1).  In turn, section 7-105.1(e) requires that "an order to docket or a complaint to foreclose a mortgage or deed of trust on residential property shall" include an affidavit stating, among other things, "[t]he date on which the default occurred and the nature of the default;" to be accompanied by "[t]he original or a certified copy of the mortgage or deed of trust; . . . [a] copy of the debt instrument accompanied by an affidavit certifying ownership of the debt instrument;" and "[i]f applicable, the original or a certified copy of the assignment of the mortgage for purposes of foreclosure or the deed of appointment of a substitute trustee[.]"  RP § 7-105.1(e).

3

**SYNOPSIS**

Before we become mired in the weeds, deeds, and documents that often obscure the big picture, we start with an overview of the case.

In June 2005, Rene Mitchell purchased residential property in the City of Bowie in Prince George's County (the "Property") and financed the $555,900.00 purchase entirely through two loans, both secured by deeds of trust. The sales contract states that Ms. Mitchell will obtain a "Conventional First Deed of Trust loan amortized over 30 years at a FIXED rate" and "a Second Deed of Trust loan amortized over 30 years at a FIXED rate[.]" The underlying case and this appeal concern the note, deed of trust, and closing on the first loan in the amount of $444,728.00.

*Conflicting Accounts*

Ms. Mitchell claims that she "sought a fixed[-]rate loan for the purchase of residential property and executed a sales contract specifying the same." At the closing, however, the loan documents that she executed were for an adjustable-rate mortgage. According to Ms. Mitchell, she halted the closing, had "VOID" stamped on the executed documents, and requested acknowledgement of the cancellation in a letter that she sent that same day to the lender, Fremont Investment and Loan ("Fremont"). Fremont then sent Ms. Mitchell three separate letters in which it agreed to cancel the loan transaction on the adjustable-rate loan and that, thereafter, Ms. Mitchell's loan was to be treated as a fixed-rate loan. Fremont also returned a copy of the deed of trust and note, bearing the "VOID" marks, to Ms. Mitchell. The first pages of the deed and note returned to Ms. Mitchell contained stamps reading "CANCELLED AND SATISFIED IN FULL without

4

recourse" dated July 15, 2005 and signed by "Fremont Investment & Loan, Lizbeth Stokes, Vice President." Evidently satisfied that she would receive the fixed-rate mortgage according to the terms of her contract, Ms. Mitchell began making fixed-rate payments on the loan and continued making payments until she defaulted in January 2013.

The Substitute Trustees argued on appeal during the first round that the "record supported" the supposition that the parties did not intend to cancel the note or deed of trust but, instead, agreed to alter the interest rate (from variable to fixed). After we remanded the case, however, they shifted their theory altogether and argued during the evidentiary hearing, and now on appeal, that the loan was never modified or cancelled. They now claim that after Ms. Mitchell defaulted, and foreclosure was imminent, she conjured her story and the supporting documents.[3]

---

[3] The Substitute Trustees also accuse Ms. Mitchell of changing her account of what happened at the closing. They point out that, although Ms. Mitchell initially stated in her affidavit that the loan documents filed with the order to docket were identical to those that she signed at the closing, "except for removal of the void markings placed upon them," at the subsequent evidentiary hearing, she denied signing the loan documents contained in the Substitute Trustees' file. They aver that the documents filed in the land records were copies of the loan documents contained in their file and, therefore, that Ms. Mitchell changed her story. As revealed in more detail below, Ms. Mitchell contended her signature must have been forged and sought to introduce expert testimony to prove it. She also admitted during her testimony, however, that she may not have collected all of the documents that she signed at the closing, and the trial court concluded that the version contained in the Substitute Trustees' file must have been a set that was never voided per her instruction.

*Procedural History*

In August 2015, the Substitute Trustees filed an order to docket the foreclosure in the Circuit Court for Prince George's County. The order to docket contained copies of a note and deed of trust that included an adjustable-rate rider. None of the documents bore any void or cancellation marks. As required by Maryland Rule 14-207, the order to docket contained affidavits attesting that the note and deed of trust were true and accurate copies.

Ms. Mitchell filed a motion to stay the sale and dismiss the foreclosure on the ground that the order to docket did not contain copies of a valid and enforceable note or deed of trust. The Substitute Trustees opposed Ms. Mitchell's averments. The motion was denied without a hearing, and Ms. Mitchell appealed.

In the prior appeal, in which the Substitute Trustees argued that the mortgage had been converted to a fixed-rate loan, we noted, upon close examination of the documents in the record, that on July 14, 2005, an adjustable-rate note and deed of trust were filed in the land records for Prince George's County. *Mitchell*, 232 Md. App. at 626. The documents—filed just three days after Ms. Mitchell terminated the closing—did not have any "VOID" stamps on them; rather, "both documents donned new stamps reading simply 'REDACTED.'" *Id.* at 627. We determined that Ms. Mitchell had presented a "facially valid defense to the foreclosure" that the instruments were forged and remanded the case. *Id.* at 641.

On remand, the Substitute Trustees first moved for limited discovery in advance of the hearing "to test or challenge the validity and veracity of the documents" that Ms.

6

Mitchell attached to her motion to dismiss. During the evidentiary hearing, however, counsel for the Substitute Trustees confirmed, not once, but twice, that proceeding directly with a full evidentiary hearing was "fine" and confirmed that in counsel's view their motion for discovery was then "moot."

The "summary" evidentiary proceeding before Judge Mittelstaedt ended up taking nine days and concluded on August 20, 2019. Ms. Mitchell and her real estate agent, Ms. Paula Kearney, testified that Ms. Mitchell had contracted for a 30-year fixed mortgage, but, at the closing, voided the documents that she had signed upon discovering that the loan documents were for an adjustable-rate mortgage. Of the individuals who were present at the closing, only Ms. Mitchell and Ms. Kearney testified at the evidentiary hearing. Ms. Mitchell explained that she sent a letter to Fremont and received confirmation that it had cancelled the variable-rate loan and "adjusted" the transaction to reflect the conventional, fixed-rate loan.

Witnesses for the Substitute Trustees testified that they were unable to locate any voided loan documents or related correspondence that would support Ms. Mitchell's account. According to the Substitute Trustees, the closing proceeded without incident, and Ms. Mitchell fabricated her account because it was not supported by any documentation in the servicer's file or in the title agent's file. The Substitute Trustees presented the testimony of an expert who opined that the loan instruments contained in the servicer's file, copies of which were filed in the land records, contained the genuine signature and initials of Ms. Mitchell.

During the February 4, 2019 hearing, Ms. Mitchell moved, for the first time, for permission to present the testimony of a forensic document expert. The court denied the motion as untimely.

At the conclusion of the evidentiary hearing, the court asked the parties to submit proposed findings of fact and conclusions of law in lieu of closing arguments. The Substitute Trustees then requested the court to consider an equitable mortgage in its submission.

In her follow-on opinion and order, signed on September 5, 2019, Judge Mittelstaedt dismissed the foreclosure action and recited the basis of her decision in meticulous detail.

## BACKGROUND

### A. The Closing

On June 8, 2005, Ms. Mitchell signed a sales contract listing the purchase price for the Property at $555,900.00. The sales contract lists a first loan of $444,720.00, and a second loan valued at $111,180.00—*both at fixed rates* and secured by deeds of trust.

In her affidavit filed in support of her motion to dismiss, Ms. Michell related that, at the closing held on July 11, 2005, she noticed, contrary to the terms of the sales contract, that the promissory note contained an adjustable interest rate and the deed of trust contained an adjustable-rate rider. She also "noted irregularities in the payments, interest rates and Truth and Lending [sic], and other documents."

Ms. Mitchell reported the error to her realtor, Ms. Kearney, and to the settlement agents who were present, identified by Ms. Mitchell as Barbara Licon and Philip Sardelis.

8

Ms. Mitchell refused to sign any more documents and requested that the closing be terminated. Although the settlement agents agreed to terminate the closing, they told Ms. Mitchell that they had to "retain any signed documents and later shred them." Consequently, Ms. Mitchell requested that they stamp a "VOID" mark on each page of each document that she signed. Ms. Licon "then stamped 'VOID' on each document, including the Adjustable Rate Promissory Note, Deed of Trust and HUD-1, and placed her initials next to each 'VOID' stamp on the cover pages of the Adjustable Rate Promissory Note, Deed of Trust and HUD-1 documents." Ms. Mitchell also placed her initials beside each "VOID" stamp.

Ms. Mitchell also wrote a note on one of the documents which read: "I requested this copy of Voided documents with Barbara Licon signature of Void [sic]. My Realtor is present to witness. We are to come back tomorrow to execute corrected documents. I have requested Fremont provide me a letter acknowledging cancellation of this debt loan, Deed + promissory note. RM[.]"

Ms. Mitchell attested to subsequent correspondence with Fremont, copies attached to her affidavit, starting with the following letter that she sent to Fremont on the day of the closing:

> I am requesting that you immediately cancel my loan and return all monies due back to me based on the Loan Documents, executed by Sandler Title & Escrow, LLC on behalf of Fremont Investment & Loan, not reflecting my sales contract[.]
> Upon my review of the signed loan documents prepared by Barbara Licon from Sandler Title & Escrow, LLC . . . [t]he loan package was not explained very well and was rushed. I saw many errors in the loan package mid-way through the closing and stopped the closing. Ms. Licon stated that they would correct the documents and I must immediately contact Fremont

9

Investment & Loan directly and cancel the original loan documents, which she kept in her possession, claiming she would have to shred. I kept the blank documents and requested her to draw a void line across each one. None of the second copy documents have my signature and I am very uncomfortable with leaving the original documents for her to shred but she states this is a normal procedure. My realtor Paula [Kearney][4] was a witness to this conversation between Ms. Licon and me as was the notary Mr. Phillip Sardelis who also signed the documents as we went through them. Both can also verify that I requested the documents to this loan be destroyed.

. . . The loan terms are:

1st Mortgage 30 year conventional firm fixed at an interest rate of 6.200%

2nd Mortgage 30 year conventional firm fixed at an interest rate of 9.125%

Please advise on what the next course of action is to provide new accurate loan documents for review and signatures.

Again, this is my official notice to cancel the original Adjustable Rate loan documents that I did not agree to purchase and were not accurate based on the attached documents for the property at . . . [.]

Fremont responded by letter on July 12, 2005, acknowledging receipt of Ms. Mitchell's request to cancel her loan. Fremont agreed to cancel the loan "transaction" and indicated there was a "new transaction" that was adjusted to provide the "proper loan requirements."[5]

---

[4] At the time of closing in 2005, Ms. Kearney's last name was Haynes. She has since changed her marital status and last name to Kearney.

[5] The text of this letter read in pertinent part:

After review of your loan and our acknowledgement of:
ERRORS AND OMISSIONS IN PROCESSING YOUR LOANS, REVIEW OF YOUR SALES CONTRACT, FIRST COMMUNITY MORTGAGE UNIFORM RESIDENTIAL LOAN APPLICATION, HUD-1 AND YOUR INTENTION TO OBTAIN A CONVENTIONAL 30 YEAR FIXED RATE LOAN.

(Continued)

10

On the that same day, Fremont issued two additional notices to Ms. Mitchell.  The

first affirmed that, "[a]s of the date of this Notice, the principal loan balance that is owed

to Fremont Investment & Loan for **444,728.00 AT 8.6770% ANNUAL PERCENTAGE**

**RATE AS REFLECTED ON THE FEDERAL TRUTH-IN-LENDING**

**DISCLOSURE STATEMENT IS CANCELLED AS OF THE ABOVE**

**REFERENCED DATE.**"  (Emphasis in original).

The second notice stated that Ms. Mitchell's loan was converted to a conventional

fixed-rate loan:

> As of the date of this Notice, the principal loan balance that is owed to Fremont Investment & Loan for **444,728.00 AT 6.200% 360 MONTHS CONVENTIONAL FIXED RATE FULLY AMORTIZING LOAN.**
> In addition, we would like to advise you that you have thirty (30) days after receipt of this Notice to dispute the validity of the above debt, or any portion thereof.  If you do not do so, the debt will be assumed to be valid.  If you canceled[,] notify us in writing within this thirty (30) day period that you dispute the debt, or any portion thereof, we will obtain and mail to you verification of the debt.
> Furthermore, you have thirty (30) days after the receipt of this Notice to request the name and address of the original creditor, if different

---

> WE HAVE CANCELLED THIS TRANSACTION, THE MORTGAGE, LIEN OF SECURITY INTEREST IS ALSO CANCELLED AND WE HAVE ADJUSTED THE NEW TRANSACTION TO REFLECT THE PROPER LOAN REQUIREMENTS.
> Within 20 calendar days we must take the steps necessary to reflect that fact that the mortgage/lien/security interest on your home has been cancelled.  You may keep any money or property we have given you until we have done the things we mentioned above, but you must then offer to return the money or property.  If it is impractical or unfair for you to return the property, you must offer its reasonable value.  You may offer to return the property at your home or at the location of the property.  Money must be returned at the address below.  If we do not take possession of the money or property within 20 calendar days of your offer, you ma[]y keep it without further obligation.

11

from the current creditor. Upon receipt of a written request from you within the thirty (30) day period, we will provide you with the name and address of your original creditor.

(Emphasis in original).

No new loan documents were executed. On July 15, 2005, Fremont returned the deed of trust and note—bearing the "VOID" marks and Ms. Mitchell's handwritten note—to Ms. Mitchell. Significantly, the first pages of the deed and note sent to Ms. Mitchell bear stamps reading "CANCELLED AND SATISFIED IN FULL without recourse" followed by a signature line dated July 15, 2005. Although it takes some deciphering, the signature line on the stamp reads "Fremont Investment & Loan, Lizbeth Stokes, Vice President."

Servicing of the loan was transferred from Fremont to HomeEq. in 2005 and then from HomeEq. to Ocwen Loan Servicing, LLC ("Ocwen") in September of 2010. The loan itself was transferred from Fremont to U.S. Bank ("USB").

After the loan servicing responsibilities were transferred to Ocwen in the fall of 2010, Ms. Mitchell received written notice from Ocwen that her mortgage, on which she had been making payments at a fixed rate for the last five years, was actually an adjustable-rate loan. Ms. Mitchell testified later at the evidentiary hearing, that in response, she called Ocwen and informed Ocwen that the interest rate was incorrect. Ms. Mitchell then sent an email to Ocwen on October 14, 2011, requesting Ocwen make an "adjustment to the mortgage rate." In addition, Ms. Mitchell testified to sending correspondence but not receiving a satisfactory response. Finally, at Ocwen's urging, Ms. Mitchell sent a "qualified written requests" for information. In total, Ms. Mitchell

12

sent six requests. In her third, dated November 17, 2014, Ms. Mitchell sought copies of the loan documents, among other things, to understand "what I was paying for, who I was paying it to, and what the issues were" and "why [Ocwen] w[as] claiming I had an [adjustable-rate mortgage] when clearly I did not."

### B. Foreclosure Proceedings

On January 1, 2013, Ms. Mitchell failed to make a payment on the loan and continued to miss installment payments each month thereafter, according to the affidavit of default and indebtedness executed by an agent for Ocwen.

### 1. Notice of Intent to Foreclose

On October 10, 2014, the Substitute Trustees, acting for USB, sent a notice of intent to foreclose to Ms. Mitchell. On August 24, 2015, the Substitute Trustees filed an order to docket foreclosure in the Circuit Court for Prince George's County.

As required by Maryland Rule 14-207, the order to docket foreclosure contained copies of a note and deed of trust as exhibits, which, as described above, revealed that 10 years earlier, a deed of trust was filed in the land records for Prince George's County on July 14, 2005—just three days after the allegedly terminated closing.

As further required by Rule 14-207, the order to docket contained an affidavit, executed by the servicing agent, stating that the deed of trust is a "true and accurate copy." Another affidavit, this one executed by Robert E. Frazier, affirmed the same, adding, "If applicable, any personal and/or private information has been redacted as noted on the document." The Substitute Trustees also filed an affidavit of default and indebtedness, stating that, as of June 25, 2015, Ms. Mitchell owed $478,879.94.

## 2. Motion to Dismiss

On September 25, 2015, before the Substitute Trustees filed the final loss mitigation affidavit, Ms. Mitchell, representing herself, filed a "Motion to Dismiss for Improper Service and Motion to Stay Sale and Dismiss Action for Failure to State a Claim" under Maryland Rule 14-211. In the motion, Ms. Mitchell asserted that the foreclosure action should be dismissed on several grounds. First, she stated that she was not served properly. In regard to the order to docket, she argued that: (1) it did not include a copy of a valid and enforceable note or deed of trust because the note and deed of trust were voided; (2) the Substitute Trustees and USB failed to plead that they owned or held the note and deed of trust; and (3) the note was non-negotiable, and the indorsement was invalid.

The Substitute Trustees filed an opposition, arguing that Ms. Mitchell was served properly and that the note and deed of trust were valid. They asserted that the loan documents had not been cancelled, but rather, "Fremont gave [Ms. Mitchell] a fixed[-]rate mortgage" after the closing. They claimed that this was consistent with the fact that Ms. Mitchell never returned the proceeds of the loan and made consistent payments for almost eight years.

On February 11, 2016, the circuit court, without a hearing, entered an order denying Ms. Mitchell's motion. Ms. Mitchell noted a timely appeal to this Court.

## 3. First Appeal

On appeal before this Court, the Substitute Trustees averred, as they did in their opposition to the motion to dismiss, that there was a "modification of the adjustable

14

interest rate mortgage to a fixed[-]rate mortgage" and that "Ms. Mitchell and Fremont agreed to modify the interest rate (from an adjustable interest rate to a fixed[-]rate mortgage) but did not cancel the Note and Deed of Trust." The Substitute Trustees summarized in their brief:

> In short, the record suggests that the parties did not intend to cancel the Note or Deed of Trust. Rather, Ms. Mitchell and Fremont agreed only to modify the interest rate.

We determined that the note and first deed of trust filed in the land records for an adjustable-rate mortgage, with "redacted" stamps and no void stamps, "suggest forgery," and that "Ms. Mitchell's Rule 14-211 motion to stay the sale and dismiss the action stated a facially valid defense to the foreclosure." *Mitchell v. Yacko*, 232 Md. App. 624, 627 (2017). We explained that, as required by Maryland Rule 14-211, "Ms. Mitchell in her motion not only asserted that the lender and its successors 'fraudulently attempt[ed] to assert rights that they did not possess,' but she also attached materially altered documents evidencing 'the fraudulent making of a false writing having apparent legal significance.'" *Id.* at 643 (quoting *Smith v. State*, 7 Md. App. 457, 460 (1969)). We held that "a party cannot institute a foreclosure upon forged documents. Foreclosure is an equitable procedure, and the Substitute Trustees must demonstrate, upon remand, that this particular foreclosure has not 'be[en] marred by [] fraudulent, illegal, or inequitable conduct.'" *Id.* at 641 (quoting *Wells Fargo Home Mortg., Inc. v. Neal*, 398 Md. 705, 730 (2007)). Accordingly, on May 31, 2017, in a reported opinion, we vacated the judgment and remanded the case for a hearing on Ms. Mitchell's motion to dismiss. *Id.* at 627.

15

**4.  Request for Limited Pre-Hearing Discovery**

On remand, the Substitute Trustees filed a motion requesting "limited discovery in the form of no more than ten (10) document requests and a maximum of two (2) depositions" in advance of the hearing on Ms. Mitchell's motion.  In support of their motion, the Substitute Trustees averred:

> In order to adequately defend themselves, and in order to test or challenge the validity and veracity of the documents that [Ms. Mitchell] presented to the [circuit court] with the Motion to Dismiss, which are solely in [Ms. Mitchell]'s possession, as well as the story of the events [Ms. Mitchell] alleges took place back in 2005, the Substitute Trustees require limited discovery.

Ms. Mitchell, through counsel, opposed on the ground that discovery is "not permitted by the rules or case law."  Specifically, citing to Maryland Rule 14-211(a)(3)(C) and *Wells Fargo Home Mortgage, Inc. v. Neal*, 398 Md. 705, 726 (2007), Ms. Mitchell averred that "Title 14 of the Maryland Rules includes a special exception to the policy of Maryland law to expedite mortgage foreclosures by permitting a <u>Defendant</u> to request documents – strictly pursuant to a Defendant's Motion to Dismiss."

The court heard argument on the applicability of discovery in a proceeding under Maryland Rule 14-207(a)(1).  As set out further in the discussion below, the court denied the motion as moot after the parties agreed to proceed with an evidentiary hearing.

16

### 5. Evidentiary Hearing

The evidentiary hearing extended over nine days during a two-year period.[6]

### a. Ms. Mitchell's Case

*Ms. Mitchell's Testimony*

On November 21, 2017, after opening arguments, Ms. Mitchell testified first. She explained that she provided instruction to her real estate agent, Ms. Kearney, to finance the purchase with a 30-year fixed-rate mortgage and provided a budget.

At the closing, once the notary arrived, Ms. Mitchell began to sign the documents that were presented to her. She was informed that she was signing with the wrong color pen and changed to a blue pen. Then, she realized that one document "had the ARM [adjustable-rate mortgage] annotated on it" instead of the 30-year-fixed rate that she anticipated. Ms. Mitchell notified the individuals at the settlement that "[t]hese were [the] wrong documents" and advised that she would not continue with the settlement. Ms. Mitchell further testified:

> Well, at first I started gathering all the documents. So, she said I couldn't have all the documents. So, that got me uncomfortable, and so I requested that she put a void stamp on the documents because they – I was – I had signed documents. And she told me that I would need to send a copy to [Fremont] right away and that she would be calling [Fremont] to let them know of the error.
>
> **\*\*\*\*\***
>
> So, I take the documents. I had her sign them, myself sign them and then I took that copy. I had to leave a copy, which made me a little

---

[6] When initially discussing the amount of time needed for the evidentiary hearing, the court noted that "I want to keep [the hearing] in the context at which [Rule 14-211] is designed for. This isn't going to be a trial. I don't want that."

uncomfortable, but Paula and Barbara both concurred, along with the notary, that they had to keep possession and shred it.

Ms. Mitchell explained that "I annotated that conversation on my documents, because it made me uncomfortable."

Ms. Mitchell's counsel then introduced into evidence what Ms. Mitchell believed was her "complete copy of [her] settlement documents." The first exhibit was the "Regional Sales Contract." Paragraph 7 of the contract indicated that "Purchaser will obtain a Conventional First Deed of Trust loan amortized over 30 years at a FIXED rate bearing interest of 6.20% per year[.]"

The next set of documents introduced into evidence were the "Uniform Residential Loan Applications." The first application, for Ms. Mitchell's first deed of trust, was an application for a conventional fixed-rate loan in the amount of $444,728 at an interest rate of 6.2%. The second application was for a conventional fixed-rate loan in the amount of $111,180.00 at an interest rate of 9.125%.

Ms. Mitchell also produced copies of the voided loan documents that she and the settlement agent struck through, as well as the "Notice to Cancel Loan" dated July 11, 2005, that she sent to Fremont. According to Ms. Mitchell, the letter's purpose was to inform Fremont of "what happened at the closing" and to inform them "that [she] did not intend for the adjustable[-]rate loan" and would need it corrected. The Notice to Cancel stated, in relevant part:

> Ms. Licon stated that [Sandler Title & Escrow] would correct the documents and I must immediately contact Fremont Investment & Loan directly and cancel the original loan documents, which she kept in her possession, claiming she would have to shred. I kept the blank documents

18

and requested her to draw a void line across each one. None of the second copy documents have my signature and I am very uncomfortable with leaving the original documents for her to shred but she states that this is a normal procedure.

The three letters from Fremont dated July 12, 2005, were introduced next. Ms. Mitchell testified that the first was a letter (set out above) cancelling the loan; the second was a "NOTICE" from Fremont, also cancelling the loan; and the third thanked her for cancelling the transaction and advised that the mortgage was converted to a conventional fixed-rate loan and that she would "receive a response within ten business days under separate cover." Ms. Mitchell affirmed that these letters were "a series of communications between [her] and [Fremont] . . . [i]ndicating an agreement . . . to cancel the note and deed of trust." Ms. Mitchell further testified that the third "adjusted the new transaction to reflect the proper loan requirements." Due to time constraints, the circuit court was required to reset the hearing.

When Ms. Mitchell resumed her testimony on July 25, 2018,[7] she explained that she thought she had reached an agreement with Fremont that "they were giving me the loan that I had a sales contract for," and that Fremont had cancelled the adjustable-rate note. Ms. Mitchell introduced three "audit letters" that she claimed Fremont provided her in December of 2005, 2006, and 2007. Ms. Mitchell testified that the letters confirmed that she had elected a fixed-rate loan.

---

[7] For scheduling reasons, Ms. Kearney testified before Ms. Mitchell resumed her testimony on July 25.

Ms. Mitchell testified that she was first alerted to problems with the loan when she received a letter from Ocwen that it was now servicing the loan and that the loan was adjustable. In response, Ms. Mitchell submitted letters to Ocwen to clarify the terms of her first deed of trust. Ocwen responded by letter on April 27, 2016. The letter enclosed copies of the pertinent closing materials and notified Ms. Mitchell that "the loan still reflects past due" and is "in foreclosure." Ms. Mitchell testified that she did not sign the documents provided by Ocwen and included in the Substitute Trustees' order to docket.

On cross-examination, Ms. Mitchell confirmed that, notwithstanding the failure to close, the prior owners moved out of the residence, and Ms. Mitchell moved in. When questioned by counsel whether she ever received a deed for the Property, Ms. Mitchell testified:

> The documents that I have from the settlement, when [Fremont] sent me the errors and omissions letters stating that they were adjusting the note to the deed, in my knowledge, that's what I had. No one ever sent me any other documents.

Ms. Mitchell also clarified, after she saw the video-taped image of Barbara Licon, that she was mistaken because Ms. Licon was not the settlement agent who was present at the closing. She explained that "someone, for some reason, was at the closing and identified themselves as Barbara [Licon], no it wasn't actually Barbara [Licon]."

Ms. Mitchell reiterated that she had not signed the documents attached to the order to docket but had no idea how the documents were signed. However, Ms. Mitchell confirmed that she "didn't gather all the documents" at the closing. Counsel directed Ms. Mitchell to the documents that the Substitute Trustees claimed were the "wet ink"

20

originals. Ms. Mitchell testified that she did not sign those documents and thought they were forged. Counsel then questioned Ms. Mitchell about whether she created a "Cancellation Notice" and purported that it had been sent by Fremont. Ms. Mitchell denied altering any documents or creating the notice.

Next, Ms. Mitchell was questioned about an email exchange between her and the Officer of the Consumer Ombudsman at Ocwen. Initially, Ms. Mitchell had written to complain about the amount of escrow and taxes that were being charged and how they were being computed. Counsel then questioned whether Ms. Mitchell had actually complained about any change in her interest rate. Ms. Mitchell responded that she was "absolutely asking [Ocwen] how [her] interest rate changed" and that she was "complaining that [her payment] went from $2,297.76 in 2005 and now they're asking me [her] to pay $2,872.02 in 2011." She expounded:

> I didn't understand what was going on with these documents at the time and that's why I'm inquiring because these documents have gone through a number of people's hands and I have a fixed[-]rate and I'm being confused of why I'm paying a different rate. And Fremont had, Fremont serviced the loan, then HomeEq serviced my loan in 2007 and then Ocwen serviced it in '11, and I'm seeing these changes and I'm not understanding them.

When presented with a copy of a check, dated July 11, 2005 (the date of the closing), in the amount of $598.55, Ms. Mitchell said she did not recall receiving the check in 2005. Ms. Mitchell also did not recall asking Ms. Kearney whether she had received her commission, but, she stated, unequivocally (and in contravention to Ms. Kearney's testimony), that she did not attend a second closing with Ms. Kearney after the cancelled closing on July 11, 2005.

21

*Ms. Paula Kearney's Testimony*

In addition to offering testimony regarding the Regional Sales Contract, Ms. Kearney testified about what happened at the closing. She confirmed that Ms. Mitchell sought a fixed-rate loan and then cancelled the closing and voided the loan documents after she determined that they were for a variable-rate mortgage. Ms. Kearney witnessed the markings that were placed on the documents and confirmed that the markings were appropriate for cancelling a mortgage. Ms. Kearney did not recall seeing any documents other than the documents marked "VOID." While Ms. Kearney testified that Ms. Mitchell had "VOID" printed on each document that she signed, she could not recall if Ms. Mitchell signed two sets of documents, left a set, or left all of the sets at the closing.

On cross-examination, Ms. Kearney testified that she and Ms. Mitchell returned to close on the loan another day, whereupon Ms. Mitchell signed corrected documents, and Ms. Kearney received her commission check.[8]

*David Sandler's Testimony*

Mr. Sandler, a practicing attorney in Maryland, is the owner of Sandler Title & Escrow, LLC. Although the company remains a legal entity, it has not been in operation since 2011 or 2012. Mr. Sandler's company represented Ms. Mitchell and the secured creditor at the closing, although one of his employees actually conducted the closing. The only document that Mr. Sandler "probably signed" was the recorded deed of trust. Mr. Sandler could neither affirm nor deny that he received a copy of the letter from

---

[8] The only loan documents in the record are dated July 11, 2005.

22

Fremont, dated July 12, 2005, cancelling the loan, because his company did not maintain a mail log. Because Mr. Sandler had documents in his possession that he brought to the hearing, the parties and court postponed his testimony to another date to allow the parties a chance to review his file.

Mr. Sandler continued his testimony on February 5, 2019. Mr. Sandler confirmed that, because he was not present at the July 11, 2005 closing, he did not witness the signing of any documents.

During cross-examination, he confirmed that his company had underwriting agreements with various title insurance companies and would issue title insurance policies and conduct closings. Mr. Sandler stated that he did not know anything about Ms. Mitchell's closing transaction aside from his file. He offered, however, that he did not see "anything out of the ordinary" besides "a check from the realtor that was written to [his] office."

In Mr. Sandler's experience, Philip Sardelis, who conducted the closing, would bring any issues that arose at closing to his attention. Nothing in the file indicated that the loan transaction had been cancelled. He stated that the closing file did not contain copies of the loan documents with "VOID" markings; instead, the file contained executed adjustable-rate loan documents, copies of which were attached to the order to docket.

The file contained "Landtech disbursement statements," which, Mr. Sandler clarified, reflected that there were "checks written on the date of closing and disbursed," including, to the prior owners of the home, the lenders, the real estate agent, and Ms. Mitchell. Mr. Sandler testified that had the loan been cancelled, it would not "have been

23

the practice of [his] office to provide refund checks to the purchaser." However, on redirect, Mr. Sandler confirmed that, in his experience, a lender could agree with the borrower to cancel a loan.

*Exclusion of Ms. Mitchell's Expert*

Following Mr. Sandler's testimony and before the Substitute Trustees put on their case, on February 4, 2019, Ms. Mitchell sought permission to call a handwriting expert, Katherine Koptenhaver. The Substitute Trustees objected for three reasons: (1) the expert was only disclosed three days before the hearing date; (2) Ms. Mitchell did not serve disclosures; and (3) Ms. Mitchell did not provide a report, other than a demonstrative exhibit emailed the night before. The circuit court did not allow the Substitute Trustees' expert to testify without providing Ms. Mitchell notice and an opportunity to review his report and depose him if necessary, and the court noted that the Substitute Trustees should have had the same opportunity. In light of the delay in identifying Ms. Mitchell's expert, the circuit court excluded the testimony.

## b. Substitute Trustees' Case

*Shannon Childs' Testimony*

The Substitute Trustees opened their case on February 4, 2019 by calling Shannon Childs, a senior loan analyst at Ocwen. Ms. Childs testified that Ocwen maintained records "on several different platforms." When a loan switches from a prior servicer to Ocwen, Ocwen incorporates the prior servicer's records.

Ms. Childs testified that Ocwen received the original collateral file in 2010, which contained "the original note, the original mortgage, also bailee letters showing the file

24

tracking, . . . and a title policy[.]"  According to Ms. Childs, the inclusion of the final title policy in the original collateral file indicated that the "loan had closed."  She testified that there was "not anything in the original collateral file that contains anything that indicates void, strike-throughs, [or] multiple signatures" or "anything in the original collateral file that shows that there is anything peculiar or unusual[.]"

Ms. Childs also stated that none of the letters exchanged between Ms. Mitchell and Fremont were in Ocwen's records, although they were the type of records she would expect to find there.  Two of the July 2005 letters sent from Fremont to Ms. Mitchell, she said, "look[ed] strange" because the margins were not justified on one of the paragraphs. In regard to the third letter, Ms. Childs observed that the margin also was not "in-lined" to reflect that "it's coming from a template," and, while the document indicator denoted "CANCELLATION NOTICE TG 4/13/04" as in one of the other letters, that letter did not cancel anything.  In regard to the three audit letters, each dated after the loan was transferred to HomeEq., Ms. Childs said that, to her knowledge, there would be no reason why a prior servicer would communicate to the borrower after the release of the loan.

On cross-examination, counsel for Ms. Mitchell directed Ms. Childs to explain Ocwen's record keeping systems and how loans are "boarded."  She testified that, when a new loan is boarded, "there's nothing in your record such as an affidavit of anyone swearing that the information coming to Ocwen is true and accurate."

*Khody Detwiler's Expert Testimony*

The Substitute Trustees called Khody Detwiler who was admitted, without objection, as an expert witness in the field of forensic document examination.  Mr.

25

Detwiler testified that he examined four original documents, including a copy of the note and deed of trust, an affidavit, and a disclosure statement, to determine whether the documents were genuinely signed by Ms. Mitchell. Mr. Detwiler opined that the "questioned documents contain the genuine signatures and initials of" Ms. Mitchell. On cross examination, he admitted that he had not separately met with Ms. Mitchell, but he reviewed the four original documents and performed a "common authorship examination" to verify that they were "written by a common writer."

*Deposition Testimony of Barbara Licon*

Finally, the Substitute Trustees admitted into evidence, and played for the court, the videotaped deposition of Barbara Licon, who deposed that she was not present at the July 11, 2005 closing and had no knowledge of Sandler Title or "the loan that was closed involving the borrower Rene Mitchell." After the Substitute Trustees concluded their case, the court granted Ms. Mitchell's request to present rebuttal testimony.

### c. Ms. Mitchell's Rebuttal

On August 20, 2019, Ms. Mitchell, testifying in rebuttal, expressed that she "was quite taken back by" Mr. Sandler's testimony, because "[h]e was not at the closing . . . [b]ut he produced documents for my closing that I had never seen[.]" Ms. Mitchell testified that she did not recall seeing the check, payable to her, in the amount of $598.55 for refund of a purchase money deposit.

In regard to Ms. Licon's videotaped deposition, Ms. Mitchell testified that she had never seen Ms. Licon before and that she was not present at the closing. She elaborated:

26

I was frustrated with my closing because they were putting these documents in front of me that had nothing to do with what my Sales Contract was. And I did not have an adjustable note. And they were telling me that they would fix the documents, but I could keep signing them. And I was very uncomfortable with that thought process. I was rattled.

And if you - - notice on Exhibit 4 in the top it says prepared by Barbara [Licon]. So, I picked up the document and I handed it, you know, so that she could visually see the document. And I said did you prepare this document. Are you Barbara [Licon]. And she said yes.

Finally, Ms. Mitchell claimed that conversations between her and representatives of Fremont, and others, were omitted from Ocwen's comment logs. At the conclusion of the evidentiary hearing, the court took the matter under advisement, and the parties submitted findings of facts and closing arguments in writing.

### 6. Request for Equitable Mortgage

In the Substitute Trustees' Proposed Findings of Fact and Conclusions of Law, the Substitute Trustees asserted, for the first time, that "U.S. Bank, as trustee[,] is entitled to an equitable lien on the property." According to the Substitute Trustees,

> By her own testimony and evidence, [Ms.] Mitchell obtained a loan for $444,728.00 to purchase the property at, she contends, a fixed interest rate of 6.200%. [Ms.] Mitchell intended to execute a deed of trust as security for payment of that debt.

Relying on *Adams v. Avirett*, 252 Md. 566, 568-69 (1969), the Substitute Trustees averred that the "Court of Appeals of Maryland has stated that when a person intended by writing to create a lien on his land to secure another, but fails to create a statutorily valid security instrument, his expressed intention may be enforced in equity." The Substitute Trustees asserted that "there is undisputed, overwhelming, evidence of an intent by [Ms.] Mitchell and Fremont to enter into an agreement to convey the property as security for

27

repayment of the $444,728.00 loan." "Lastly," the Substitute Trustees asserted that if U.S. Bank were not provided an equitable lien, then Ms. Mitchell "would receive an inequitable windfall at the expense of the lender."

## 7. Memorandum Opinion and Order

In a comprehensive opinion, Judge Mittelstaedt set out the material evidence presented by the parties and assessed the credibility of the witnesses. The judge determined:

> Ms. Mitchell has established that the lien and the lien instrument is invalid, and that [the Substitute Trustees] have no right to foreclose in the pending action. Pursuant to the Order to Docket that [the Substitute Trustees] filed on August 24, 2015, [the Substitute Trustees] are attempting to foreclose on an *adjustable[-]rate* mortgage. The [c]ourt finds, however, that [the Substitute Trustees' do not hold a valid *adjustable[-]rate* mortgage, as it was voided in lieu of a *fixed[-]rate* mortgage.

In support of this finding, the court enumerated the following evidence:

(1)  The Property sales contract indicated that the deeds of trust would be amortized over 30 years at a fixed rate;

(2)  Ms. Mitchell completed two loan applications for both deeds of trust for a fixed rate, 30-year mortgage from Fremont;

(3)  At the closing, Ms. Mitchell stopped the closing and execution of the documents, after she realized that the loan documents she was signing incorrectly stated that the loan was for an adjustable[-]rate mortgage;

(4)  After Ms. Mitchell stopped the closing, Ms. Mitchell made strike-through markings on the signed documents, and a "VOID" mark was placed on each document;

(5)  On July 11, 2005, Ms. Mitchell informed Fremont of the errors in the loan documents and requested cancellation of the loan via letter;

(6)  On July 12, 2005, Fremont responded by letter, acknowledged receipt of Ms. Mitchell's request to cancel her loan, agreed to cancel the loan

"transaction," and indicated that there was a "new transaction" that was adjusted to provide the "proper loan requirements.";

(7) On the same day, Fremont issued a notice to Ms. Mitchell, which affirmed that, "a[s] of the date of this Notice, the principal loan balance that is owed to Fremont Investment & Loan for 444,728.00 AT 8.6770% ANNUAL PERCENTAGE RATE AS REFLECTED ON THE FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT IS CANCELLED AS OF THE ABOVE REFERENCED DATE.";

(8) On July 15, 2005, Fremont sent a letter to Ms. Mitchell, acknowledging her "Notice to Cancel Loan" letter, and indicating that her request "has been forwarded to the appropriate departments." Fremont returned the documents marked "VOID" to Ms. Mitchell, with new stamps that read "CANCELLED AND SATISFIED IN FULL without recourse," followed by a signature line, dated July 15, 2005, that read "Fremont Investment & Loan, Lizbeth Stokes, Vice President.";

(9) On December 13, 2005, December 11, 2006, and December 10, 2007, Fremont sent routine "LOAN AUDIT" letters to Ms. Mitchell, which acknowledged that, "Our records indicate that you elected our Convention 30-year fix rate fully amortizing loan product."; and

(10) Although no new loan documents were ever executed for the fixed rate loan, Ms. Mitchell moved into the Property in 2005, and made payments on the loan at a fixed rate for at least five years under two different loan servicers.

The court noted that, although the Substitute Trustees "disputed Ms. Mitchell's account" of the closing, they "did not present testimony from anyone that was present at the closing to support [their contention that the adjustable-rate documents were signed and never voided] or to refute Ms. Mitchell's account." The court found Ms. Mitchell's

29

account credible and, with one noted exception,[9] determined that "Ms. Kearney, Ms. Mitchell's real estate agent at the time of the purchase, who was present at the closing, corroborated Ms. Mitchell's account of what occurred."

The court resolved that, "in light of the fact that it is undisputed that Ms. Mitchell made payments at a fixed rate for five years under Fremont and HomeEq, and that those fixed rate payments were accepted. . . Ms. Mitchell's account of what occurred [is] much more believable." The fact that neither the closing file held by Sandler Title & Escrow nor the loan servicing file contained the voided documents was not surprising because "they were never in their possession."

Although "Ms. Mitchell denied that her signature was on the loan documents," the court credited Mr. Detwiler's expert testimony and concluded that the signatures on the loan documents filed with the order to docket were Ms. Mitchell's. The court reasoned that, even though Ms. Mitchell thought she had placed void marks on all of the documents "it is plausible that [the Substitute Trustees] had in their possession unmarked, signed copies of the loan documents that were used to initiate the foreclosure proceeding."

The court also found that "the various versions of the loan documents submitted by [the Substitute Trustees], further support Ms. Mitchell's challenge to the validity of the documents." Specifically,

---

[9] Judge Mittelstaedt noted that, while Ms. Kearney "incorrectly testified that a second closing took place," she found the remainder of her testimony credible "[d]espite this minor inconsistency." She observed that "Ms. Kearney testified that because she received her commission check, a second closing must have taken place."

After nine evidentiary hearings, [the Substitute Trustees] never explained why the documents filed with the [o]rder to [d]ocket are different from those filed with the land records, why they are redacted, what exactly was redacted[.]

In regard to the accusation that Ms. Mitchell did not object to the adjustable rate until after the foreclosure was initiated, the court found:

There would not have been any reason for her to complain about her loan interest rate because she had been paying her mortgage at a fixed[-]rate as she expected. Moreover, [the Substitute Trustees] did not present any evidence that indicated during those five years, during which there were two different loan servicers, Ms. Mitchell had ever been notified by the lender or loan servicers that she was making incorrect payments regarding interest. Ms. Mitchell did not have any issues regarding the fixed interest rate until the third loan servicer, Ocwen, became the servicer and began to accrue interest at an adjustable rate.

Finally, the circuit court found that "the contradiction in [the Substitute Trustees]' arguments call into question [their] credibility regarding the events that took place during and after the closing." Specifically, the court noted that the Substitute Trustees argued in their opposition to Ms. Mitchell's motion to dismiss that "Fremont gave [Ms. Mitchell] a fixed[-]rate mortgage . . . [but] [t]he interest rate was modified, [and] the Note and Deed of Trust remain valid and enforceable." However, at the hearing, they "made the opposite argument: the loan was never modified or cancelled, the loan was and has always been an adjustable[-]rate mortgage, and Ms. Mitchell has fabricated the story regarding the stopped closing, the voided documents, and the letters sent from Fremont after the closing." The court concluded:

Given the weight of the evidence and the [c]ourt's findings that the testimonies of Ms. Mitchell and Ms. Kearney are credible, the [c]ourt finds that Ms. Mitchell has established that the lien and lien instruments are invalid, and that [the Substitute Trustees] have no right to foreclose on an

31

adjustable mortgage.  [The Substitute Trustees] failed to submit a valid adjustable rate lien instrument and note.  Thus, [Ms. Mitchell]'s Motion to Stay Sale and Dismiss Action for Failure to State a Claim is GRANTED.

On September 9, 2019, the circuit court entered an order: (1) granting Ms. Mitchell's Motion to Stay Sale and Dismiss Action for Failure to State a Claim; (2) dismissing the Substitute Trustees' order to docket; and (3) ordering that the case be closed statistically.

The Substitute Trustees noted a timely appeal and present four issues, which we recast as follows:[10]

---

[10] The Substitute Trustees phrased their questions presented as follows:

"1.  Did the [c]ircuit [c]ourt err in holding that Mitchell carried her burden of demonstrating that the Substitute Trustees lacked the right to foreclose where the [c]ourt's findings to support that determination were not based upon evidence in the record, and, in many instanced, contradict the evidence presented?

2.  Did the [c]ircuit [c]ourt err in crediting Mitchell's version of events transpiring at the July 11, 2005 loan closing, where that version of events was, in light of the undisputed evidence in the record, incredible and impossible as a matter of law?

3.  Did the [c]ircuit [c]ourt err in denying the Substitute Trustees' motion for limited pre-hearing discovery, where all the evidence Mitchell intended to use to demonstrate her alleged cancellation of the 2005 loan transaction (and, therefore, the unenforceability of the debt obligation sued upon by the Substitute Trustees) was (1) uniquely in her possession and (2) subject to vigorous challenge by the Substitute Trustees as inauthentic?

4.  Did the [c]ircuit [c]ourt err in not granting the Substitute Trustees' request, in the alternative, for the imposition of an equitable mortgage, given that, even under Mitchell's version of events, she was advanced substantial sums of money for the purpose of purchasing the Property

(Continued)

32

1. Did the circuit err in holding that the Substitute Trustees did not hold a valid note and deed of trust and, accordingly, lacked the right to foreclose?

2. Did the circuit court err in crediting Ms. Mitchell's version of events at the closing because her version was impossible as a matter of law?

3. Did the circuit court abuse its discretion in denying the Substitute Trustees' motion for limited pre-hearing discovery?

4. Did the circuit court err in denying the Substitute Trustees' request for the imposition of an equitable mortgage?

In her cross-appeal, Ms. Mitchell challenges the circuit court's decision to exclude her expert's testimony as untimely.[11]

## STANDARD OF REVIEW

On appeal of a non-jury action, we apply the standard of review expressed in Maryland Rule 8-131(c):

> When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witness.

We consider the evidence presented at the nine-day evidentiary hearing before Judge Mittelstaedt "in a light most favorable to the prevailing party, and, if substantial

---

which she intended to be secured by it, and which not have been repaid?"

[11] Ms. Mitchell phrased her question presented on cross-appeal as follows:

"Absent the parties conducting discovery and a scheduling order establishing dates of discovery, did the [c]ircuit [c]ourt err by excluding the [sic] Ms. Mitchell's expert testimony expert testimony as being untimely while allowing the Substitute Trustee to present expert testimony?"

evidence was presented to support the trial court's determination, it is not clearly erroneous, and cannot be disturbed." *Pettiford v. New Generation Tr. Serv.*, 467 Md. 624, 639 (2020). "If any competent material evidence exists in support of the trial court's factual findings, those findings cannot be held to be clearly erroneous." *MAS Assocs., LLC v. Korotki*, 465 Md. 457, 474 (2019) (quoting *Webb v. Nowak*, 433 Md. 666, 678 (2013)). Absent an abuse of discretion, "we may not substitute our judgment for that of the fact finder, even if we might have reached a different result[.]" *Gordon v. Gordon*, 171 Md. App. 583, 626 (2007) (citation omitted).

## DISCUSSION

## I.

## Substantial Evidence

## A. Parties' Contentions

The Substitute Trustees contend that the circuit court's conclusion that the note and deed of trust affixed to the order to docket was not valid and enforceable should be reversed. They aver that the court's "determinations were not based upon evidence in the record and, in many instances, contradict the evidence presented." In support, the Substitute Trustees contend: "Most prominently, the [c]ircuit [c]ourt did not find, notwithstanding Mitchell's testimony to the contrary, that the signed version of the loan documents included with the [o]rder to [d]ocket was a forgery signed by someone other than Mitchell." According to the Substitute Trustees, "[t]his conclusion fatally undermined [Ms.] Mitchell's version of events," and required the circuit court, in order to "square th[e] circle," to find that Ms. Mitchell "signed **other** documents which Sandler

34

Title retained and which Mitchell did not mark void." According to the Substitute Trustees, because the circuit court "split the difference," its reasoning cannot be sustained. The Substitute Trustees contend that, because Ms. Mitchell testified that "no 'unmarked, signed copies of the loan documents' existed," the court's finding that "it is plausible that [the Substitute Trustees] had in their possession unmarked, signed copies of the loan documents that were used to initiate the foreclosure proceeding," was not plausible because "there is no factual basis for it in the record." The Substitute Trustees further attack the court's findings, including the court's failure to address why the prior owners would give title to Ms. Mitchell without payment.

Ms. Mitchell avers, in response, that "[t]he factual findings and determination of the [c]ircuit [c]ourt were supported by competent evidence in the record and detailed explanation, and therefore the appellate court should give great deference to the [c]ircuit [c]ourt's decision." The court's determination was supported by "ten separate findings," and the court "thoroughly discussed [the Substitute Trustees]' contentions." Ms. Mitchell concluded: "even under the best light, a factfinder's choice between two permissible views of the evidence presented before it cannot be clearly erroneous."

In reply, the Substitute Trustees aver that Ms. Mitchell left its initial points unrebutted, "instead resting on the notion that they were all aired in front of the [c]ircuit [c]ourt and resolved against the Substitute Trustees." According to the Substitute Trustees, "traditional deference to trial court credibility determinations does not require that it ignore situations, like this one, where those determinations are based upon findings which are not only unsupported by the record, but positively contradicted by it."

35

## B. Analysis

It is well-established in Maryland that "[w]hen weighing the credibility of witnesses and resolving conflicts in the evidence, 'the fact-finder has the discretion to decide which evidence to credit and which to reject.'" *Qun Lin v. Cruz*, 247 Md. App. 606, 629 (2020) (quoting *Hollingsworth & Vose Co. v. Connor*, 136 Md. App. 91, 136 (2000)). "The fact finder 'may believe or disbelieve, credit or disregard, any evidence introduced, and a reviewing court may not decide on appeal how much weight must be given to each item of evidence.'" *Id.* (cleaned up). We accord significant deference to the circuit court's factual findings and limit our analysis to whether competent evidence supports the court's findings. *MAS Assocs., LLC*, 465 Md. at 474.

The trial judge specifically referenced ten points in support of her determination that the Substitute Trustees did not hold a valid lien for an adjustable-rate mortgage, as the lien instruments filed with the order to docket indicated, because the adjustable-rate lien was "voided in lieu of a *fixed[-]rate* mortgage." First, as Ms. Mitchell testified, paragraph 7 of the contract indicated that "Purchaser will obtain a Conventional First Deed of Trust loan amortized over 30 years at a FIXED rate bearing interest of 6.20% per year[.]"

Second, Ms. Mitchell testified that she completed two loan applications for two fixed-rate loans, which were jointly admitted into evidence. The first application, for Ms. Mitchell's first deed of trust, was for a conventional, *fixed-rate* loan in the amount of $444,728 at an interest rate of 6.2%.

36

Third and fourth, as Ms. Mitchell testified and Ms. Kearney corroborated, Ms. Mitchell stopped the closing when she realized that the documents incorrectly provided a loan for an adjustable-rate mortgage. Ms. Mitchell attested (consistently with her pro se motion to dismiss) that she and the settlement agent notated the cancellation of the loan and struck through the signed documents. Ms. Kearney confirmed that Ms. Mitchell sought a fixed-rate loan, cancelled the closing, and voided the adjustable-rate documents.

Fifth, as detailed above, Ms. Mitchell sent a "Notice to Cancel Loan" dated July 11, 2005, that was introduced into evidence. According to Ms. Mitchell, she sent the letter to Fremont to inform the lender "what happened at the closing" and "that [she] did not intend for the adjustable[-]rate loan" and would need it corrected.

Sixth, seventh and eighth, Ms. Mitchell introduced into evidence the three letters she received from Fremont concerning the cancellation of her adjustable-rate loan and its conversion to a fixed-rate loan. On behalf of the Substitute Trustees, Ms. Shannon Childs, an employee of Ocwen, testified that she thought the letters looked suspicious because, among other things, some margins were out of place. Ms. Childs' testimony concerned the practices of a company with which she had no identifiable association. The court found Ms. Childs' testimony unconvincing because she did not address the fact that the correspondence was on Fremont letterhead. The trial court also made plain elsewhere in her opinion that she understood that the Substitute Trustees relied on these very same letters to support their initial theory that, rather than having been cancelled, the adjustable-rate loan was converted to a fixed-rate loan.

Ninth, Ms. Mitchell introduced three "audit letters" into evidence that, she testified, Fremont provided to her in December of 2005, 2006, and 2007.[12]

Tenth, it is undisputed that Ms. Mitchell moved into the Property in 2005 and made payments on the loan at a fixed-rate for at least five years under two different loan servicers. Ms. Mitchell testified that she was first alerted to problems with the loan only after Ocwen began servicing her loan in 2011.

The Substitute Trustees, through the testimony of Ms. Childs, tried to prove that there was nothing in the history of the loan files to support Ms. Mitchell's contention that she raised any issues about her interest rate until she was in foreclosure. However, there is evidence in the record that, after the loan was transferred, Ocwen informed Ms. Mitchell in a letter (signed by someone other than Ms. Childs), that she had an adjustable-rate loan. Ms. Mitchell testified at the evidentiary hearing that she called Ocwen and informed her servicer that the interest rate was "wrong." She then sent an email to Ocwen on October 14, 2011, requesting it make an "adjustment to the mortgage rate." After she did not receive a satisfactory response to her inquiries, at Ocwen's urging, she sent Ocwen "qualified written requests" for information. In total, Ms. Mitchell sent six requests. In her third, dated November 17, 2014, Ms. Mitchell sought copies of the loan documents, among other things, to understand "what I was paying for,

---

[12] The Substitute Trustees aver that these audit letters "bore indicia of alteration" because each referenced a "recent loan" with Fremont and referenced a "Convention" rather than a "Conventional" loan. Judge Mittelstaedt was not persuaded by these typos that Ms. Mitchell forged the letters.

who I was paying it to, and what the issues were" and "why [Ocwen] w[as] claiming I had an [adjustable-rate mortgage] when clearly I did not."

We are aware that contrary evidence was presented at the evidentiary hearing in opposition to some of the court's findings. But that is not dispositive here. The court's finding that Ms. Mitchell's testimony was credible and that the evidence generally supported her version of events was not "erroneous—clearly or otherwise—merely because the circuit court could have drawn different 'permissible inferences which might have been drawn from the evidence by another trier of the facts.'" *Omayaka v. Omayaka*, 417 Md. 643, 659 (2011) (citation omitted).

In challenging the circuit court's factual determinations, the Substitute Trustees largely focus on what they perceive to be discrepancies in Ms. Mitchell's testimony. In at least one instance where her testimony appears contrary to the circuit court's finding, they contend that "there is no factual basis for [the court's finding] in the record." More specifically, the Substitute Trustees assert:

> Mitchell's steadfast testimony that she placed void markings on all documents she signed and did not sign the unmarked versions attached to the Order to Docket, therefore presented a binary resolution for the [c]ircuit [c]ourt: either her version of the closing was true, and the documents attached to the Order to Docket were forged, or her story was not true, and the transaction had not been cancelled but closed normally.

We reject the Substitute Trustees' contention that the circuit court was constricted to a "binary choice." They overlook Ms. Mitchell's testimony, on cross-examination, that she "didn't gather all the documents" at the closing. This testimony supports the trial court's conclusion that the Substitute Trustees' file contained a version of the incorrect

39

loan documents that were signed but not voided. As the factfinder, the court analyzes the evidence and decides what to credit and what to reject. *Santiago v. State*, 458 Md. 140, 156-57 (2018) (affirming that "the fact finder 'may believe or disbelieve, credit or disregard, any evidence introduced, and a reviewing court may not decide on appeal how much weight must be given to each item of evidence'") (citing *Great Coastal Express, Inc. v. Schruefer*, 34 Md. App. 706, 725 (1977)); *Qun Lin*, 247 Md. App. at 629.

Ms. Mitchell and Ms. Kearney presented their sworn testimony. The Substitute Trustees did not refute their sworn testimony with that of anyone else who was present at the closing. The Substitute Trustees could not explain the discrepancy between the applications and the sales contract for a fixed-rate mortgage and the adjustable-rate loan documents presented to Ms. Mitchell at closing. They claimed that Ms. Mitchell forged the void marks on the loan documents and fabricated the letters from Fremont, but they did not present Lizbeth Stokes, Vice President of Fremont, to prove that she did not sign the cancellation stamps shown on the voided loan documents. Nor did they call the employees from Fremont or Ocwen who actually corresponded with Ms. Mitchell.

Significantly, however, the Substitute Trustees were able to convince the court that the loan file they inherited contained a signed copy of the adjustable-rate loan documents and no voided copies. After ten years and three different loan servicers, the trial judge concluded that the Substitute Trustees were not to blame for the unscrupulous mortgage transaction. But that finding did not leave the court with the "binary choice" urged by the Substitute Trustees.

Clearly, the evidence presented by the Substitute Trustees to support their revised theory of the case—that Ms. Mitchell made everything up—fell woefully short, and the validity of the lien instrument could not be established against the unrefuted evidence presented by Ms. Mitchell. Viewing all the evidence in the light most favorable to Ms. Mitchell, we hold that substantial evidence in the record supports the circuit court's factual findings and that the court did not err in its determination that the lien instrument upon which the Substitute Trustees filed the order to docket foreclosure was invalid.

## II.

## Legally Impossible Testimony

### A. Parties' Contentions

The Substitute Trustees argue, in the alternative, that, "even if the Court conclude[d] that the evidence offered by Mitchell was sufficient to cross the threshold of sufficiency to prove her right to relief," the court "erred in crediting that testimony because it was incredible and legally impossible as a matter of law." According to the Substitute Trustees, "[Ms.] Mitchell's story" "lacks any foundation in logic." Specifically, the Substitute Trustees aver that "[i]t is incredible that Fremont would have permitted, without complaint, hundreds of thousands of dollars to be disbursed without any documentation of that loan or the security interest protecting its repayment."

In response, Ms. Mitchell argues that the "[c]ircuit [c]ourt provided clear and sufficient evidence in support of its determination of witnesses' credibility" and that "nothing in the record suggests that Ms. Mitchell offered physically impossible testimony." Rather, Ms. Mitchell notes that the court "specifically pointed out the

41

contradiction in [the Substitute Trustees]' arguments that call into question [the Substitute Trustees]' credibility."

## B. Analysis

Long ago, the Court of Appeals instructed courts when to disregard a witness's testimony as lacking in probative value:

> We, of course, accept the rule that the court should disregard any testimony that attempts to establish something physically impossible within common knowledge and experience, or something contrary to indisputable scientific principles or laws of nature within the court's judicial knowledge.

*York Motor Exp. Co. v. State, for Use of Hawk*, 195 Md. 525, 534-35 (1950). Otherwise, "the question of a witness's credibility is left to the [fact finder]." *N.B.S., Inc. v. Harvey*, 121 Md. App. 334, 343 (1998).

The Substitute Trustees rely on *Ray v. Bassil*, 30 Md. App. 550, 555, 562 (1976) and *Tippett v. Quade*, 19 Md. App. 49, 56 (1973), for the principle established in *York Motor Express* that testimony supporting a judgment may be rejected as not credible due to legal impossibility. In *Ray*, we held, as a matter of law, that a witness's testimony that the plaintiff was in a crosswalk when injured was "not credible" and "legally impossible" because there was no crosswalk near where the plaintiff was struck. *Id.* at 562. Likewise, in *Tippett*, we held that the plaintiff's "unsupported and uncertain testimony" that the accident might have taken place on the shoulder "'approaches,' if indeed, it does not exceed, 'the outer limits of credibility'" because uncontroverted physical evidence showed that the accident took place in the traveled portion of the road. 19 Md. App. at 58 (citation omitted). Rather, the accident was caused when the plaintiff had suddenly

42

backed onto the highway, and, thus, the circuit court should have granted a directed verdict, since "there was no evidence from which the jury could have inferred that any negligence on [the part of the defendant driver] was a concurring proximate cause of an accident which he could not have avoided." *Id.* at 52, 64.

The Court of Appeals addressed the impact of contradictory testimony in *Kucharczyk v. State* 235 Md. 334, 338 (1964). There, the Court held that the defendant's testimony was so fraught with impossibilities as to render it devoid of any probative value. *Id.* at 337-38. In *Kucharczyk*, an intellectually disabled sixteen-year-old boy testified both that the defendant attempted to rape him and that he did not attempt to rape him. *Id.* at 338. The defendant was convicted of assault and battery and argued before the Court of Appeals that the evidence was insufficient to support his conviction. *Id.* at 338. The Court of Appeals agreed, noting "there were unqualified statements by the prosecuting witness that the crime for which the appellant was convicted never in fact occurred." *Id.* at 338. The Court held: "When a witness says in one breath that a thing is so, and in the next breath that it is not so, his testimony is too inconclusive, contradictory, and uncertain, to be the basis of a legal conclusion." *Id.* at 338.

Writing for this Court in *Bailey v. State*, 16 Md. App. 83, 95-97 (1972), Judge Moylan clarified the narrow application of the doctrine espoused in *Kucharczyk*:

> Despite the limited utility of the doctrine, the life of *Kucharczyk* has been amazing for the number of occasions on which and the number of situations in which it has been invoked in vain. *Kucharczyk* does not apply simply because a witness's trial testimony is contradicted by other statements which the witness has given out of court or, indeed, in some other trial. Nor does *Kucharczyk* apply where a witness's trial testimony contradicts itself as to minor or peripheral details but not as to the core issues of the

43

very occurrence of the corpus delicti or of the criminal agency of the defendant. Nor does *Kucharczyk* apply where the testimony of a witness is 'equivocal, doubtful and enigmatical' as to surrounding detail. Nor does *Kucharczyk* apply where a witness is forgetful as to even major details or testifies as to what may seem improbable conduct. Nor does *Kucharczyk* apply where a witness is initially hesitant about giving inculpatory testimony but subsequently does inculpate a defendant. Nor does *Kucharczyk* apply where a witness appears initially to have contradicted himself but later explains or resolves the apparent contradiction. Nor does *Kucharczyk* apply where a State's witness is contradicted by other State's witnesses. Nor does *Kucharczyk* apply where a State's witness is contradicted by defense witnesses. Nor does *Kucharczyk* apply where a witness does contradict himself upon a critical issue but where there is independent corroboration of the inculpatory version. In each of those situations, our system of jurisprudence places reliance in the fact finder to take contradictions or equivocations properly into account and then to make informed judgment in assessing a witness's credibility and in weighing that witness's testimony. Even in a pure *Kucharczyk* situation, the ultimate resolution is solely in terms of measuring the legal sufficiency of the State's total case and not in terms of the exclusion of the contradictory witness's testimony.

*Id.* at 95-97 (citations omitted) (cleaned up).

Here, the Substitute Trustees concede that it was not incredible that Ms. Mitchell "called off the closing after determining that there were errors in the loan documents[.]" What the Substitute Trustees claim "is incredible, and where Mitchell's story went off the rails, was her inability to explain a series of events following this allegedly cancelled closing," including why the prior owners of the Property would give title to Ms. Mitchell "without payment." Of course, what the Substitute Trustees omit is that Ms. Mitchell never denied, once she realized it, that someone filed what purported to be an adjustable-rate deed of trust in the land records, indicating that, despite Fremont's representations to the contrary, someone at Fremont either forged or retained a signed copy of the adjustable-rate loan and processed it. This would explain the "series of events" that the

44

Substitute Trustees claim cannot be reconciled with Ms. Mitchell's testimony, including why the prior owners would give title to Ms. Mitchell. The Substitute Trustees know that the prior owners of the Property did not move out without being paid, because *they* presented the Landtech disbursement statements at the evidentiary hearing showing that they were.

Unlike *Ray* and *Tippett*—cases in which physical evidence precluded the fact-finder from relying on a witness's testimony—Ms. Mitchell's testimony can be reconciled with the evidence very easily. Even setting the land records filing aside, Ms. Mitchell's belief that the mortgage was converted to a fixed-rate loan, based on the correspondence from Fremont, also squares with the "series of events" following the cancelled closing. We find bewildering the Substitute Trustees' claim that the court's determination was legally "impossible" *after they asserted the very same theory*—that the interest rate was modified to a fixed-rate—in the first appeal *and relied on the very same notice letters from Fremont* cancelling the adjustable-rate mortgage and converting it to a fixed-rate. We conclude that the conflicts presented in this case did not present a "physical impossibility" under *York Motor Express* or *Kucharczyk*; but rather, ordinary inconsistencies that the circuit court was entrusted to resolve. As addressed above, this is exactly what Judge Mittelstaedt did.

# III.

## Limited Pre-Hearing Discovery

### A. Background

At the hearing on September 8, 2017, the court received argument on the applicability of discovery in a proceeding under Maryland Rule 14-211. After limited argument from Ms. Mitchell's counsel, the following exchange occurred.

> COUNSEL FOR THE SUBSTITUTE TRUSTEES: Your Honor, if I may very briefly. I think part of the confusing issue is we did file a motion for prehearing discovery to the extent that [counsel for Ms. Mitchell]'s argument goes to that I can understand that.
>
> Putting that motion to . . . any discovery aside, as Your Honor is aware, it is common practice for a hearing in an order to docket foreclosure, a hearing on a Rule 14-211 motion for testimony to be taken, testimony of the Defendant, testimony for someone as the validity of documents filed for the order to docket foreclosure.
>
> I don't think that is asking anything beyond the bounds of a regular quasi-judicial order the docket foreclosure. And, so, we would at the very least ask Your Honor to schedule a normal Maryland Rule 14-211 hearing where testimony or witnesses may be put forth.
>
> COUNSEL FOR MS. MITCHELL: That is all [Ms. Mitchell] is asking. . . . [Ms. Mitchell] takes issue with the [Substitute Trustees]' request to take depositions and to conduct other prehearing discovery. So, [Ms. Mitchell] is willing and able to make [herself] available for a motion to dismiss hearing.
>
> THE COURT: Well, then why not just have a motion to dismiss hearing, that is what I hear you saying?
>
> COUNSEL FOR THE SUBSTITUTE TRUSTEES: That is fine, Your Honor.
>
> THE COURT: Okay. Then this request for discovery is going to be denied.
>
> COUNSEL FOR THE SUBSTITUTE TRUSTEES: That is fine, Your Honor.

Shortly thereafter, the court and parties engaged in a second exchange:

> THE COURT: . . . So, the motion [for pre-hearing limited discovery] - - I guess I can just say it is moot. Is that - -
>
> COUNSEL FOR THE SUBSTITUTE TRUSTEES: That is fair, Your Honor, it is sufficient.
>
> THE COURT: Okay.
>
> COUNSEL FOR MS. MITCHELL: Thank you, Your Honor.
>
> THE COURT: It is moot, okay. And this is a motion to - - it is the [S]ubstitute [T]rustee[s'] request for limited prehearing discovery. . . . That motion is moot.

## B. Parties' Contentions

The Substitute Trustees contend that the circuit court abused its discretion in denying their request for limited discovery. They claim that discovery was necessary because they had no knowledge or involvement with the closing and were, accordingly, at an unfair advantage and, further, lacked the ability to contest the authenticity of the documents that Ms. Mitchell included with her motion to dismiss. Relying on *Gallagher Evelius & Jones, LLP v. Joppa Drive-Thru, Inc.*, 195 Md. App. 583, 596 (2010), they contend that discovery was necessary to "advance the sound and expeditious administration of justice."

In response, Ms. Mitchell argues that the Substitute Trustees "acquiesced" to the circuit court's decision to deny their motion to conduct pre-hearing discovery and that "[t]here was no objection raised, no argument made." According to Ms. Mitchell, the Substitute Trustees were "clearly satisfied with the result." Further, Ms. Mitchell asserts

that "there were no exceptional situations presented to the lower court that would warrant limited pre-hearing discovery."

## C. Analysis

This Court reviews the denial of discovery under an abuse of discretion standard. *Sibley v. Doe*, 227 Md. App. 645, 658 (2016) (citing *Beyond Systems, Inc. v. Realtime Gaming Holding Co.*, LLC, 388 Md. 1, 28 (2005)). The circuit court "abuses its discretion only if no reasonable person would take the view adopted by the trial court in denying discovery." *Id.*

We hold that the Substitute Trustees acquiesced to the circuit court's decision to proceed with the evidentiary hearing without pre-hearing discovery. Before denying the Substitute Trustees' request for pre-hearing discovery, the circuit court inquired "why not just have a motion to dismiss hearing?" Not just once, but ***twice***, counsel for the Substitute Trustees confirmed that the court's proposal was "fine." Further along in the hearing, the Substitute Trustees' counsel confirmed that their motion was "moot" and deemed the plan to move forward with an evidentiary hearing "sufficient." Even, assuming arguendo, that the exchange between the court and counsel for the Substitute Trustees did not reflect the Substitute Trustees' acquiescence, we fail to see how the circuit court abused its discretion in this instance when the Substitute Trustees did not object to the court's proposal. We conclude that the circuit court did not abuse its discretion in denying the Substitute Trustees' request for discovery.

48

# IV.

## Equitable Mortgage

## A. Parties' Contentions

Finally, the Substitute Trustees maintain that "even if the Court affirms the decision below in favor of [Ms.] Mitchell, the [c]ircuit [c]ourt[] nonetheless erred in declining to consider the Substitute Trustees' request for an equitable mortgage in favor of USB." The Substitute Trustees urge:

> Thus, even accepting the version of events found by the [c]ircuit [c]ourt, there is undisputed, overwhelming, evidence of an intent by [Ms.] Mitchell to enter into an agreement to convey the Property as security for repayment of the $444,728 advanced by Fremont, an obligation which is now owned by USB. But the [c]ircuit [c]ourt not only did not grant the Substitute Trustees their requested relief, it did not even address it. The [c]ircuit [c]ourt's failure to do so mandates reversal and remand for the [c]ircuit [c]ourt to consider the issue in the first instance.

Ms. Mitchell counters that the Substitute Trustees "waived any claim of relief for a so-called 'equitable mortgage'" by only first raising it after the close of the hearing. "Accordingly, the [c]ircuit [c]ourt properly ignored the [Substitute Trustees'] alleged relief for an equitable mortgage because it was not properly briefed and was not properly argued during the evidentiary hearing." Further, Ms. Mitchell contends that the doctrine of equitable mortgage does not apply in this case because Ms. Mitchell did not intend to enter into a binding mortgage.

In their reply, the Substitute Trustees contend that there was no waiver because, pursuant to Maryland Rule 2-517(c), "it is sufficient that a party, at the time the ruling or order is made or sought, makes known to the court that action that the party desires the

court to take." Because the court was aware that they were seeking an equitable mortgage, the Substitute Trustees aver, we can address the merits of their arguments. The Substitute Trustees highlight that "the equitable mortgage they seek is the fixed[-]rate mortgage which [Ms.] Mitchell believed she entered into, as evidenced by her occupancy of the house and her years of payments to USB."

## B. Analysis

The Court of Appeals has held that "an agreement purporting to be a mortgage may be treated as such under the doctrine of equitable mortgages." *Taylor Elec. Co., Inc. v. First Mariner Bank*, 191 Md. App. 482, 497 (2010) (citing *Lubin v. Klein*, 232 Md. 369, 371 (1963)). The Court explained:

> It is well settled in this State, since *Dyson v. Simmons*, 48 Md. 207 (1878), that generally where an instrument intended to operate as a mortgage fails as a legal mortgage because of some defect or infirmity in its execution, an equitable mortgage may be recognized, with priority over judgments subsequently obtained. *See also Jackson v. County Trust Co.*, 176 Md. 505 [, 6 A.2d 380] (1939); *Western Bank v. Union Bank*, 91 Md. 613[, 46 A. 960] (1900); *cf. Berman v. Berman*, 193 Md. 614[, 69 A.2d 271] (1949). The theory underlying the equitable mortgage doctrine is that an instrument which is intended to charge certain lands, even though defectively executed, is nevertheless considered to be evidence of an agreement to convey, and a court of equity should enforce the obligation despite the technical defects in the instrument.

*Id.* at 497-98 (quoting *Lubin*, 232 Md. at 371).

In *Taylor Electric*, a creditor claimed that a mechanic's lien took priority over a defective deed of trust and filed a complaint for declaratory and other relief, seeking declaration on the priority of the mechanic's lien. *Id.* at 486. Even though the recorded deed of trust did not contain any legal description of the property, the Court ruled that a

50

companion loan agreement showed that the borrower intended to provide a bank a mortgage on the property. *Id.* at 499-500. Because "a defective instrument should be treated as an equitable mortgage when the intent of the parties is obvious," *id.* at 498, the Court held that "[b]ased on all of the evidence before the trial court, there is no question that [the borrower] intended to convey the property *via* the deed of trust," *id.* at 500.

In this case, the primary failure of the Substitute Trustees is not their factual averments, and we make no determination as to the merits of their ultimate entitlement to an equitable mortgage. Rather, the Substitute Trustees' arguments fail for a more fundamental reason.

The "law is settled that '[a] party cannot allege one cause of action and introduce evidence to prove another and different one.'" *Martinez ex rel. Fielding v. The John Hopkins Hosp.*, 212 Md. App. 634, 680 (2013) (quoting *Zeller v. Greater Balt. Med. Ctr.*, 67 Md. App. 75, 82 (1986)). "The purpose behind this principle is clear. A defendant must have notice of the allegations lodged so he or she can use his or her best efforts to disprove the charges." *Zeller*, 67 Md. App. at 82. This principle is magnified in the instant case by the procedural vehicle chosen by the Substitute Trustees to enforce their rights under the alleged mortgage.

Our Courts have recognized that a "power of sale" foreclosure proceeding, governed by Title 14 of the Maryland Rules and commenced under Maryland Rule 14-207(a)(1), "'is intended to be a summary, in rem proceeding[.]'" *Huertas v. Ward*, 248 Md. App. 187, 201 (2020) (quoting *Wells Fargo Home Mortg., Inc. v. Neal*, 398 Md. 705, 726 (2007)); *see also Pulliam v. Dyck-O'Neal, Inc.*, 243 Md. App. 134, 143 (2019)

51

("Foreclosure is a summary *in rem* proceeding that grants the mortgagee the power to dispose of the property.") (citation omitted). As a summary proceeding meant to demonstrate a plaintiff's right to foreclose, "[i]n a strict sense, 'an order to docket is not a pleading,' because it does not 'raise issues between the parties' and need not 'contain any factual allegations.'" *Huertas*, 248 Md. App. at 201 (citing *Pacific Mortg. & Inv. Grp., Ltd. v. LaGuerra*, 81 Md. App. 28, 39 (1989)). The remedy, confined to Title 14 of the Maryland Rules, is the sale of the property. *See* Md. Rule 14-214-16 (providing procedure for sale procedure). The Maryland Rules only allow for this process when there is no doubt as to the validity of the lien and lien instruments. *See* Md. Rule 14-207(b) (providing requirements to foreclose). The sole objective of a power of sale is to allow sale of the property as stated in the mortgage, in the event of default. *Simard v. White*, 383 Md. 257, 281 (2004). In other words, an order to docket foreclosure is premised on the requirement that the lender has submitted true and accurate copies of the lien instruments, has a right to foreclose, and can calculate the debt. Under Maryland Rule 14-211, a borrower or other interested person may challenge the validity of the lien or the right of the lender to foreclose by filing a motion to stay the sale and dismiss the action. Md. Rule 14-211(a)(3)(B); *see also Bates v. Cohn*, 417 Md. 309, 318 (2010); *Daughtry v. Nadel*, 248 Md. App. 594, 602 (2020).

Alternatively, an equitable mortgage is pursued precisely because the instrument is *defective*. *Taylor Elec. Co.*, 191 Md. App. at 497. "An equitable mortgage results from different forms of transactions in which there is present an intent of the parties to make a mortgage, to which intent, for some reason, legal expression is not given in the form of

52

an effective mortgage; but in all such cases the intent to create a mortgage is the essential feature of the transaction." *Id.* at 498 (cleaned up) (quoting *W. Nat'l Bank v. Nat'l Union Bank*, 91 Md. 613, 621 (1900)). In short, the purposes behind an order to docket and a proceeding to enforce an equitable mortgage are distinct.[13]

In any case, the record supports the trial court's decision to ignore the Substitute Trustees' efforts to seek an equitable mortgage at the eleventh hour. They did not assert their entitlement to an equitable mortgage when they filed their order to docket, or allege any entitlement to an equitable mortgage in any pleading, or assert any such claim at any point during the *nine-day evidentiary hearing, which covered two years*. Instead, after the close of all evidence, the Substitute Trustees asserted, for the first time, that "U.S. Bank, as trustee[,] is entitled to an equitable lien on the property." The impact of the Substitute Trustees' last-minute request deprived Ms. Mitchell of any opportunity to respond and, certainly, deprived her of the ability to present her evidence at the hearing in light of this claim. Accordingly, we hold that the circuit court did not err by not considering the Substitute Trustees' post-hearing request for an equitable mortgage.

---

[13] Alternatively, for example, where a lien instrument contains neither a power of sale nor an assent to a decree, the plaintiff may file a complaint to foreclose, and the action "shall proceed in the same manner as any other civil action." Md. Rule 14-208(a). As with any other civil action, a party may "state as many separate claims or defenses as the party has, regardless of consistency and whether based on legal or equitable grounds." Md. Rule 2-303(c). Whereas an order to docket is not a pleading and is confined to Title 14, a complaint to foreclose *is* a pleading and, except as provided in Rule 14-208 (b), proceeds as any other civil action.

# V.

## Excluding Expert Testimony

In Ms. Mitchell's cross-claim, she insists that the circuit court erred in excluding her expert's testimony because the "exclusion of the evidence caused undue prejudice to [her] and did not prejudice the Substitute Trustee."  As the record demonstrates, Ms. Mitchell's expert was only disclosed three days before the February 4, 2019 hearing, six months after the first hearing date.  Ms. Mitchell did not serve disclosures and did not provide a report, other than a demonstrative exhibit emailed the night before.  The judge had imposed the requirement that both parties' experts were to be disclosed in sufficient time to offer the other party an opportunity to review the expert's report and depose the expert.  The judge determined that three days' notice, without disclosures or a report, was not sufficient notice.  A trial court's "action in admitting or excluding [expert] testimony will seldom constitute a ground for reversal." *Alford v. State*, 236 Md. App. 57, 71 (2018).  We cannot discern how the judge erred or abused her discretion in determining that Ms. Mitchell failed to follow the court's expert disclosure requirement to give reasonable and proper notice.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANTS.**

54

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/1586s19cn.pdf